(No. 59050.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOHN E. WHITEHEAD, Appellant.

*Opinion filed February 20, 1987.—Modified on denial of rehearing June 5, 1987.*

432

SIMON, J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, and Gary S. Rapaport, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma J. Stewart, Solicitor General, and Mark L. Rotert

and Terence M. Madsen, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

The defendant, John Whitehead, was convicted of murder and aggravated kidnaping (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1, 10—2) in July 1983, following a jury trial in the circuit court of Grundy County. The defendant waived his right to a jury for purposes of a death penalty hearing, and a sentence of death was imposed by the circuit judge. The defendant's execution was stayed (87 Ill. 2d R. 609(a)) pending direct review by this court (Ill. Const. 1970, art. VI, sec. 4(b); 103 Ill. 2d R. 603).

Vickie Wrobel, a five-year-old girl who lived with her parents in Joliet, was missing from the family residence during the evening of August 9, 1982. While searching for her, Vickie Wrobel's mother asked the Wrobels' tenant, Esther Harmon, whether she had seen Vickie. Esther Harmon, her daughter, LeAllen Starbuck, and LeAllen's husband, William Starbuck, lived with the defendant in a house adjacent to the Wrobels' tavern and home. On speaking with Vickie Wrobel's mother, Esther Harmon discovered that both the defendant and the Harmon car, which the defendant sometimes used with her permission, were also missing. Local police agencies were notified that the defendant was suspected of stealing Esther Harmon's car and that he might have taken Vickie Wrobel.

Sometime after midnight the following morning, the defendant telephoned the Wrobels' tavern and spoke with LeAllen Starbuck. He told LeAllen that he was calling from Samuel and Jeanine Starbucks' home in Godley; Jeanine is the defendant's sister and is married to William Starbuck's brother. LeAllen advised the defend-

ant to stay at his sister's home, and she then told the police where the defendant was located.

Shortly after LeAllen's call, area police arrived at the Starbuck residence in Godley. The officers saw Esther Harmon's automobile parked in front of the residence, and from outside the car officers observed clothing on the front seat of the car that matched the description of clothing worn by Vickie Wrobel when she disappeared the previous evening. Samuel Starbuck let the officers into his living room, where the defendant was seated. The defendant admitted to being in possession of Esther Harmon's car, and he was arrested for auto theft.

The defendant was questioned by two detectives of the Joliet police department from about 4 a.m. until 6:30 a.m. that day. He was generally responsive, but when questioned concerning the whereabouts or condition of Vickie Wrobel, the defendant made no statements other than "I can't" or "I can't tell you." The interrogation ended when the defendant indicated a desire to consult with an attorney.

An hour or so later, at approximately 7:30 a.m. on August 10, 1982, railroad workers discovered a naked body, later identified as the body of Vickie Wrobel, floating in the Mazon River. An autopsy revealed that the victim had been sexually molested and had been killed by strangulation and drowning. Physical evidence recovered alongside the river included articles of the victim's clothing and a shirt later identified as the shirt worn by the defendant on the evening of August 9. In the shirt pocket there was a lottery ticket with writing that a handwriting analyst identified as the defendant's.

Additional physical evidence implicating the defendant was found in Esther Harmon's automobile. Some of the victim's clothing was on the front seat. Also found was a plastic drinking cup similar to that given Vickie Wrobel by the Wrobels' bartender shortly before the girl

disappeared. The armrest and passenger door panel were stained with a fluid that was determined to have a chemical composition consistent with the nonalcoholic "cocktail" served to Vickie Wrobel in the plastic cup. The floormats in Esther Harmon's car were damp, and vegetation like that growing along the Mazon River was also found on the floor area in front of the driver's seat. Other evidence produced at trial placed the defendant in the general vicinity where Vickie Wrobel was playing immediately prior to her apparent kidnaping.

While in the custody of the Joliet police department on the 10th and 11th of August, the defendant made eight statements to investigating officers in which he admitted kidnaping, sexually assaulting, and killing Vickie Wrobel. His description of how he sexually abused the victim was consistent with the autopsy report, and the defendant's claim of having forced Vickie Wrobel to drink beer was also substantiated by the post-mortem examination. The defendant contends that those confessions resulted from the officers' failure to follow procedural safeguards required by *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, to protect suspects' fifth and fourteenth amendment rights (U.S. Const., amends. V, XIV). The substance of the defendant's argument on appeal is that his confessions were obtained only after the police reinitiated interrogation, in violation of *Edwards*, following the defendant's request to consult with counsel. Defendant argues that reinitiation occurred when a confrontation between the defendant and LeAllen Starbuck was orchestrated by the police. The State contends that the defendant reinitiated the interrogation by making an unprompted statement to Detective Albritton following a conversation the defendant had with LeAllen Starbuck. The admissibility of the defendant's statement thus turns

on the characterization of his conversation with LeAllen: if the conversation is cast as a form of police interrogation, the statements should have been excluded; otherwise, the defendant's statements were properly admitted.

LeAllen Starbuck, defendant's sister-in-law, was allowed to visit with the defendant within hours of his request to see an attorney and before an attorney had been consulted. The police had not sought out LeAllen's cooperation; in fact, Detective Albritton of the Joliet police department refused her original request to speak with the defendant shortly after the defendant had invoked his right to counsel. Nonetheless, LeAllen approached Detective Albritton at the Wrobel residence and again asked to speak with her brother-in-law. Albritton told LeAllen to meet him at the police station, and when she arrived Albritton asked the defendant whether he wanted a visitor. Seeing LeAllen outside the room, the defendant indicated that he did, and Albritton left LeAllen so that she could speak with the defendant privately.

Relying on *People v. Baugh* (1974), 19 Ill. App. 3d 448, the defendant argues that LeAllen became a police "instrumentality" who funneled information to the authorities because her interests were so closely aligned with theirs. In *Baugh*, the appellate court determined that a suspect was subjected to custodial interrogation when the victim's attorney questioned the suspect in the presence of police officers, but *Baugh* is clearly distinguishable from the facts of this case. LeAllen's interests were not aligned with those of the police authorities because she wanted the defendant to confide in her that he was innocent of kidnaping Vickie Wrobel. Although LeAllen told Detective Albritton that if the defendant would speak with anybody it would be with his sister or with her, she plainly did not have an identity of interest

with the police because, as LeAllen testified at the hearing on defendant's motion to suppress, she wanted "to hear that he didn't do it; to hear that it wasn't true." The case is further distinguished from *Baugh* by the absence of police officers during LeAllen's conversation with the defendant. *Cf. People v. Hawkins* (1972), 53 Ill. 2d 181.

Moreover, there was no evidence that LeAllen intended either to persuade the defendant to give a statement to the police regarding the missing child or to pass along to the police any statements the defendant might make to her. Nor did LeAllen become an unwitting instrument of the police who exploited her ignorance of Vickie Wrobel's death. Contrary to the defendant's representations in this appeal the record shows that, at the time LeAllen spoke with the defendant on the morning of his arrest, the body found by the police had not been identified as the body of Vickie Wrobel but LeAllen was aware that a body had already been found. We therefore do not consider LeAllen to have been a police agent or instrumentality during her conversation with the defendant.

In light of LeAllen's statement to Albritton that the defendant would speak to her or Jeanine, the defendant argues that the police should have known that the defendant was especially vulnerable to an appeal from his family; therefore, the defendant believes, the police engaged in a course of conduct that they should have realized was "reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980), 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308, 100 S. Ct. 1682, 1689-90.) We do not believe, however, that LeAllen's conversation with the defendant was the sort of police conduct that *Miranda* perceived as undermining the privilege against self-incrimination. *Miranda* requires the use of procedural safeguards because of the

subtle pressures that may be exerted through "incommunicado interrogation of individuals in a police-dominated atmosphere." (*Miranda v. Arizona* (1966), 384 U.S. 436, 445, 16 L. Ed. 2d 694, 707, 86 S. Ct. 1602, 1612.) A defendant's voluntary decision to see and speak with a close relative—the defendant testified that he felt closer to LeAllen Starbuck than to his sister Jeanine—does not activate "the central concerns of *Miranda*" (*United States ex rel. Church v. DeRobertis* (7th Cir. 1985), 771 F.2d 1015, 1019), for private discussions with family members while in custody do not "reflect a measure of compulsion above and beyond that inherent in custody itself." (*Rhode Island v. Innis* (1980), 446 U.S. 291, 300, 64 L. Ed. 2d 297, 307, 100 S. Ct. 1682, 1689.) In deciding precisely this question in *United States ex rel. Church v. DeRobertis*, the seventh circuit noted that "*Miranda* itself was a response to subtle (and not so subtle) police practices that might undercut the suspect's will and thus amount to 'compulsion' to testify against oneself." (771 F.2d 1015, 1019.) Because the decision by Joliet officers to allow the defendant to visit with a close family member did not contain an element of police trickery or overbearing, their conduct did not offend defendant's fifth and fourteenth amendment rights. See *Arizona v. Mauro* (U.S. May 4, 1987), 41 Crim. L. Rptr. 3081.

Adopting the defendant's position would tend to exacerbate the coercive atmosphere of the police station because it would forbid visitation by a suspect's relatives during the period before the suspect's meeting with counsel. The refusal to let relatives visit a suspect in custody was one of the police practices that the *Miranda* court identified as vitiating the fifth amendment privilege (*Miranda v. Arizona* (1966), 384 U.S. 436, 453-55, 16 L. Ed. 2d 694, 711-12, 86 S. Ct. 1602, 1617); to hold now that the prophylactic aspects of *Miranda* require

that police engage in a form of conduct that the Supreme Court condemned would turn *Miranda*'s protections around. Support from family members is likely to alleviate the coercive elements of custodial interrogation and should not be discouraged, but regardless of the impact that genuine family contact may have in a particular case, the private relationship among family members is a personal matter. So long as police have not incited or coached family members to prompt a confession, it is not a proper area for judicial intrusion to perpetuate the incommunicado nature of police custody.

The defendant next argues that the trial court erroneously denied a defense motion for a change of venue that alleged that pretrial publicity would make it impossible to impanel a fair and unbiased jury in Grundy County. Citing a number of articles published in the Morris Daily Herald, the defendant claims that the jury pool in Grundy County was exposed to inflammatory and prejudicial information—such as the defendant's possible involvement in another missing-child case and his own request for the death penalty in this case—that jurors would be unable to purge from their memories during trial and deliberation.

A change of venue is required only when "there are reasonable grounds to believe that the prejudice alleged actually exists and that by reason of the prejudice there is reasonable apprehension that the accused cannot receive a fair and impartial trial." (*People v. Berry* (1967), 37 Ill. 2d 329, 331.) This court has previously held that it will not review the trial court's decision denying a motion for a change of venue but will instead examine the proceedings at trial to determine "whether upon the record as a whole the defendant[ ] received a trial before a fair and impartial jury." (*People v. Yonder* (1969), 44 Ill. 2d 376, 388.) In examining the partiality of jurors, we are mindful that jurors need not be "totally ignorant of

the facts and issues involved." *Irvin v. Dowd* (1961), 366 U.S. 717, 722, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1642.

Having examined the *voir dire* proceedings in this case and the text of newspaper articles cited by the defendant, we cannot say that the defendant was deprived of a fair trial because of pretrial reports in the Morris Daily Herald. Three jurors did not read the Morris newspaper, one juror did not read beyond the headlines, another had not read of the case at all, and three other jurors testified that they had read no stories regarding the case during the months immediately preceding trial. All the jurors testified that they had formed no fixed opinions about the defendant's guilt, and none of the jurors claimed to remember the substance of the defendant's statements. Because the jurors did not indicate familiarity with any prejudicial information regarding the case—indeed, there was no indication that jurors knew any facts at all—this case is clearly distinguishable from *People v. Taylor* (1984), 101 Ill. 2d 377, where jurors had learned through pretrial press reports of highly prejudicial information regarding polygraph examinations.

The Constitution requires that jurors be able to lay aside their opinions and decide the case on the facts presented at trial. (*Irvin v. Dowd* (1961), 366 U.S. 717, 723, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1643.) The defendant argues that a trial court may not rely solely on jurors' claims that their personal opinions will be set aside and news accounts disregarded. As previously noted, however, *voir dire* revealed that the impaneled jurors had neither opinions regarding the defendant's guilt nor specific knowledge of prejudicial information about the crime or the contents of the defendant's inculpatory statements. Therefore, even if jurors may in some instances be unable to set aside preconceived opinions of

guilt or knowledge of facts even though they sincerely believe they may (see *People v. Taylor* (1984), 101 Ill. 2d 377, 393), that danger cannot be of concern in this case.

Furthermore, an examination of the articles printed in the Morris Daily Herald does not reveal a hysterical or prejudgmental interest by the news media. Emotionally charged words were not used—the defendant was reported to have made "statements," not "confessions"—and he has identified only one article regarding the case that was published during the two-month period preceding *voir dire*. We are unable to conclude that "the minds of jurors or potential jurors were poisoned" (*Irvin v. Dowd* (1961), 366 U.S. 717, 730, 6 L. Ed. 2d 751, 761, 81 S. Ct. 1639, 1647 (Frankfurter, J., concurring)) by the newspaper accounts of the defendant's prosecution.

Finally, we note that defense counsel themselves did not regard the impaneled jurors as unfair or biased. They did not challenge for cause a single juror, later impaneled, on the grounds of fixed opinions or knowledge of prejudicial information. (*People v. Gendron* (1968), 41 Ill. 2d 351, 356.) Considering the entire record, we do not believe that the defendant has established that the denial of his motion for a change of venue resulted in his conviction by a biased jury or after an unfair trial.

The defendant claims that the trial court erroneously decided that testimony regarding his prior crimes could be elicited on the State's examination of two defense witnesses. A defense motion *in limine* sought to limit the State's cross-examination of Dr. Marvin Ziporyn, defendant's psychiatric expert, to preclude questions regarding the defendant's admissions of previous knife attacks on young girls. The defendant had made those admissions during the course of psychiatric examinations in 1975 while being prosecuted for attempted rape and aggravated battery. A second defense motion *in limine* attempted to prevent the prosecution from using the 1975

admissions to discredit the defendant if he testified at trial. Both motions were denied by the trial judge, who indicated that the State would be afforded an opportunity to raise the earlier admissions of knife attacks on young girls depending upon the testimony actually elicited on direct examination of Dr. Ziporyn and the defendant. The trial court also declined to accept the defendant's offer of proof that would have set out the substance of his direct testimony so that the court could determine *in limine* the scope of appropriate cross-examination. The defendant claims that his insanity defense was dropped and that he did not testify at trial because of the trial court's rulings on these motions.

Because neither Dr. Ziporyn nor the defendant testified, this court cannot determine whether the trial court would have erroneously permitted the State to raise the substance of defendant's 1975 statements in cross-examination. The defendant claims that Dr. Ziporyn was not called because evidence of prior crimes would have been allowed. The State responds to that claim by saying that the doctor was not called because the State would impeach his testimony with evidence of previous false claims of amnesia by the defendant. The record supports both explanations, demonstrating the difficulty of reviewing hypothetical cross-examination. This court should not speculate what the substance of Dr. Ziporyn's and the defendant's testimony on direct examination would have been or what the prosecution would have asked during cross-examination of those witnesses, and it follows that no decision on the appropriate scope of cross-examination can be had on appeal of this case. Counsel must stand on their objections and call the witnesses, thus opening the possibility that an erroneous decision on the scope of examination might occur and require review by a reviewing court, or forgo calling the witnesses and adopt an alternative strategy. But defense

counsel may not have it both ways by altering their trial strategy to make the best of the trial court's order, depriving the reviewing court of a reviewable record, and still maintain that the order was erroneously entered. See *Casey v. Baseden* (1986), 111 Ill. 2d 341, 349.

It is argued that the trial court's refusal to decide the scope of cross-examination *in limine*, or after an offer of proof on the substance of the defendant's direct testimony, denied the defendant an opportunity to present evidence in his own behalf. (*Washington v. Texas* (1967), 388 U.S. 14, 18 L. Ed. 2d 1019, 87 S. Ct. 1920.) In *Luce v. United States* (1984), 469 U.S. 38, 83 L. Ed. 2d 443, 105 S. Ct. 460, however, the Supreme Court also declined to review a trial court's refusal to limit the government's cross-examination of the defendant with an order *in limine*. The Supreme Court gave two reasons for its decision that a defendant must actually testify in order to preserve the claimed error for review:

> "On a record such as here, it would be a matter of conjecture whether the [trial c]ourt would have allowed the Government to attack [defendant's] credibility at trial by means of the prior conviction. *** [And] the reviewing court also has no way of knowing whether the Government would have sought to impeach with the prior conviction." (469 U.S. 38, 42, 83 L. Ed. 2d 443, 448, 105 S. Ct. 460, 463.)

The Supreme Court also rejected the argument that a trial court must accept an offer of proof and advise the defendant whether the offered testimony would open the door for cross-examination to which the defendant objects, because "his trial testimony could, for any number of reasons, differ from the proffer." (469 U.S. 38, 41 n.5, 83 L. Ed. 2d 443, 447 n.5, 105 S. Ct. 460, 463 n.5.) The logic of *Luce* applies to the testimony offered by both the defendant and other defense witnesses. *United States v. Dimatteo* (11th Cir. 1985), 759 F.2d 831.

The defendant also claims to have been denied a fair trial by the prosecutors' allegedly improper closing arguments. Three specific claims are made in this respect. The defendant claims first that prosecutors impermissibly highlighted the defendant's failure to testify at trial. The defendant's counsel sought to reduce the inculpatory impact of the defendant's confessions by arguing that the confessions were coerced and had been made only to appease the defendant's interrogators. In closing argument, the State argued that the jury should not "listen to facts that have not been introduced in evidence ***. Unless that witness has been sworn up there on the witness stand you will not have had the opportunity to observe the demeanor of the witness ***." Defense counsel interrupted, objecting that the prosecutor was "implying that there are witnesses somewhere," and the court sustained the objection. Later, after defense counsel had suggested in closing argument that the defendant's shirt had been planted in the river by some other party, the State responded:

"What do you have before you? Unrebutted, *undenied*, uncontradicted that the defendant both in a tape recorded statement and a written statement admitted drown[ ]ing Vicki[e] Wrobel. *** Not one piece of evidence put on by either party contradicts that.

\*\*\*

What do you have that is uncontradicted, *undenied*, unrebutted? That the shirt was found in the water on the 12th [of August], in a few feet of water out in the very river where Vicki[e] Wrobel was found, and it had hairs, head hairs, both of Vicki[e] Wrobel and of the defendant, John Whitehead.

\*\*\*

You have evidence, *undenied*, unrebutted, uncontradicted, that these 2 pieces of clothing [belonging to the victim] were found in a car that John Whitehead had taken from the garage area that belonged to Esther Har-

mon that were not clothes that Esther Harmon put in there." (Emphasis added.)

Second, the defendant argues that the prosecutors improperly made an issue of defense counsel's sincerity. Counsel raised two defenses, that the defendant was too intoxicated to form the necessary *mens rea* of the offenses charged and that a person other than the defendant committed the crimes at issue, but the prosecutors argued that counsel did not believe their own defenses. "Finally," the State argued, "they present to you a defense of intoxication, but it is as little believed by them as it should be by you." Furthermore, the defendant now contends that the prosecutors' closing remarks purposefully misled the jury by suggesting that defendant's theories of intoxication and a guilty third party were sufficient in law only if the jury believed both defenses. The State argued in rebuttal that the "defense tactic is to place a number of defenses in front of you, because they all have to work or none of them work. \*\*\* They are both contradictory and yet they have to stand together under the defense's theory."

The defendant also claims that the State deprived him of a fair trial by referring to the defendant as a "pervert." In closing argument, defense counsel denied the existence of any motive for the defendant to kidnap Vickie Wrobel from her parents' home. In rebuttal, the State explained:

> "John Whitehead in his statements told you what his reason was: He got sexual pleasure from molesting a 5-year old girl. He is a sex pervert. That's his reason. It is very simple. It is very plain."

We are constrained from reaching the merits of these three instances of claimed prosecutorial misconduct because of defense counsel's failure to make a timely objection. He also failed to include the issues in the post-trial motions that the defendant filed. (*People v. Black* (1972),

52 Ill. 2d 544, 551; *People v. Needham* (1961), 22 Ill. 2d 258, 259; see *People v. Gacy* (1984), 103 Ill. 2d 1, 88 (arguing insincerity of defense expert); *People v. Stewart* (1984), 104 Ill. 2d 463, 488 (commenting on defendant's failure to testify); *People v. Jackson* (1981), 84 Ill. 2d 350, 357-58 (prosecutor's reference to defendant as "an outlaw and a felon" and his appeal to jurors to not make Joliet an easy target).) Although objection was made to the prosecutor's admonition that the jury should rely only on the evidence presented at trial and that no evidence had been presented that suggested that the defendant's statements were obtained by coercion, the trial court sustained that objection and defendant did not request a cautionary instruction. Indeed, the very obliqueness of the reference made it likely that a cautionary instruction would bring the defendant's failure to testify more to the minds of the jurors than did the statements objected to, and in any event, counsel did not raise the failure to give a cautionary instruction in his post-trial motions as a basis for a new trial. It is significant to note that all the allegedly improper arguments could have been cured by defendant's prompt objection (*United States v. Handman* (7th Cir. 1971), 447 F.2d 853 (comment on failure to testify); *People v. Sawyer* (1969), 42 Ill. 2d 294 (comment on failure to testify); *United States v. DiGiovanni* (7th Cir. 1968), 397 F.2d 409 (prosecutor accused defense counsel of a "cheap trick"); *People v. Perez* (1983), 113 Ill. App. 3d 143 (prosecutor's reference to defendant as a "hit man" and a "butcher")), and for that reason the defendant's failure to object and cure the allegedly prejudicial argument precludes him from raising those arguments as grounds for a new trial. See *People v. Caballero* (1984), 102 Ill. 2d 23, 38.

The defendant claims that these instances of misconduct amounted to plain error. (87 Ill. 2d R. 615(a).) "Be-

fore plain error can be considered as a means of circumventing the general waiver rule, it must be plainly apparent from the record that an error affecting substantial rights was committed." (*People v. Jackson* (1981), 84 Ill. 2d 350, 359.) An issue that would ordinarily be considered to have been waived may be raised on appeal where "the evidence is closely balanced or where the error was of such magnitude that the accused was denied a fair trial." (*People v. Stewart* (1984), 104 Ill. 2d 463, 488.) In light of the overwhelming evidence of defendant's guilt in this case—his numerous confessions, and the physical evidence tying the defendant to the scene of the murder and linking the victim with the car in defendant's possession—we do not believe that the comments complained of amounted to plain error. First, we do not believe that the prosecutor's remarks in the context in which they were made would have been construed by the jurors as comments on the defendant's failure to testify. (See *People v. Lyles* (1985), 106 Ill. 2d 373, 389-91; *cf. People v. Wollenberg* (1967), 37 Ill. 2d 480, 487-88.) Moreover, the defendant's theories of defense were far too weak to overcome the overwhelming evidence of his guilt: there was no evidence to support the defendant's theory that he was framed by a jealous husband, with whose wife the defendant was having an affair, and the defendant's ability to drive Esther Harmon's automobile and successfully navigate paths and roads from the Mazon River to the home of Samuel Starbuck enfeebled the intoxication defense (*People v. Madej* (1985), 106 Ill. 2d 201, 217). It should be noted also that the trial court accurately instructed the jury on the law regarding the defendant's theories of innocence. Furthermore, the prosecution's isolated reference to the defendant as a "sex pervert" cannot be considered "so seriously prejudicial that it prevent[ed] the defendant from receiving a fair trial" (*People v. Sullivan* (1978), 72

Ill. 2d 36, 42) when it was but a single comment that might have been a fair reflection of the evidence adduced at trial and a response to defense counsel's denial of any possible motive the defendant might have had to kidnap Vickie Wrobel. Although the reference may have been improper, under these circumstances it does not amount to plain error. In sum, the evidence was not so closely balanced nor was the error of such magnitude as to call into question the fairness of defendant's trial; consequently, any impropriety in the prosecution's closing arguments does not rise to the level of plain error.

The defendant further argues that the exclusion of five prospective jurors, who were excused for cause because of their opposition to capital punishment, denied him his right to a jury drawn from a fair cross-section of the community and produced a jury that was conviction-prone. Since oral argument in this case, however, the United States Supreme Court, in *Lockhart v. McCree* (1986), 476 U.S. 169, 90 L. Ed. 2d 137, 106 S. Ct. 1758, has decided both questions against the defendant.

Following the defendant's convictions for murder and aggravated kidnaping, the State requested a hearing to determine whether he should be sentenced to death. The defendant waived a jury for that purpose, and the trial judge conducted the hearing in two stages. It was established that the defendant was born in 1949 and therefore was 18 or older at the time of the murder, and the trial judge determined that two separate grounds existed that made the defendant eligible for the death penalty: that the defendant killed the victim in the course of committing another felony, and that the victim was under 16 years of age and was killed in an exceptionally brutal or heinous manner indicative of wanton cruelty (see Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(b)(6), (b)(7)). Following those determinations, the parties presented evidence in aggravation and mitigation. The State intro-

duced evidence of other crimes committed by the defendant, including his previous convictions for arson and burglary. The State also presented testimony from several witnesses who described acts of molestation committed against them by the defendant. The defendant offered a defense of insanity in mitigation of his conduct. In his testimony at the hearing, the defendant explained that he had experienced a feverish feeling for about a week preceding the attack on the Wrobel girl, and he said that he was unable to remember committing the crimes involved here. A psychiatrist who testified in the defendant's behalf believed that the defendant was suffering from an organic brain disorder at the time of the offenses and therefore could not conform his conduct to the requirements of law. In rebuttal, a psychiatrist testified that the defendant was sane at the time of the offenses and, furthermore, that he was not suffering from an extreme mental or emotional disturbance. The trial judge sentenced the defendant to death for his murder conviction.

The defendant raises a number of arguments against his death sentence and the sentencing proceeding. The defendant first argues that he did not make a valid waiver of his right to a jury at the sentencing hearing. The defendant contends that the trial judge, in admonishing him of his jury right, incorrectly suggested that the decision not to impose the death penalty would require a unanimous verdict. For this reason, the defendant argues that his decision to forgo a jury was not voluntary, intelligent, and knowing.

The defendant correctly observes that unanimity is required only for the decision to impose a sentence of death and that the jury's inability to agree to impose the death sentence does not result in a mistrial but rather precludes imposition of the death penalty. In advising the defendant of his right to a jury, the trial judge made the

following remark, which the defendant contends was an inaccurate statement of the rule:

"THE COURT: And those 12 people would decide whether or not you should receive the death penalty if they were to be your jury. Do you understand that?

DEFENDANT: Yes, I do."

The defendant believes that the trial judge's remark suggested that the decision not to impose the death penalty, like the decision to impose the death penalty, would require a unanimous verdict by all 12 jurors.

We do not agree with the defendant's interpretation of the trial judge's admonition. The trial judge said nothing about unanimity but simply explained that the jury would have the power to decide whether or not the death penalty should be imposed. Although the rule regarding unanimity and nonunanimity at a capital sentencing hearing means that the vote of only one juror is sufficient to preclude a sentence of death, the rule does not reduce the number of persons who sit on the jury. Moreover, if the jury fails to impose the death penalty, its role in the sentencing process ends there, and the circuit judge is then required to impose a sentence of imprisonment. (See *People v. Morgan* (1986), 112 Ill. 2d 111, 141.) For these reasons, it was correct for the trial judge to say that "those 12 people" on the jury would determine whether or not the death penalty was to be imposed. This court has declined to require a specific admonition that the decision to impose the death penalty must be unanimous (*People v. Albanese* (1984), 104 Ill. 2d 504, 535-36; *People v. Brownell* (1980), 79 Ill. 2d 508, 536), and we do not believe that the advice here was inaccurate or misleading.

The defendant next argues that the trial judge's decision to impose the death penalty rested in part on unreliable evidence of other crimes. In June 1975 the defendant admitted himself to Elgin State Hospital; at that

time he was facing charges of attempted rape and aggravated battery, and the record of his treatment there suggests that the purpose of his voluntary commitment was to develop an insanity defense to those pending charges. According to reports made at that time, the defendant told staff members that he frequently sought out adolescent girls in vacant fields or along railroad tracks and forced them, at knifepoint, to commit acts of oral sex; the defendant also explained that those attacks were preceded by feverish feelings lasting about a week. Notes from one session attended by the defendant and his wife indicated that the defendant's wife apparently was unaware of this chapter of his personal history. At the conclusion of the defendant's hospital stay the defendant was disappointed that the staff would not accommodate his insanity defense. One staff member wrote: "[The defendant] went along with the idea of discharge and linkage to the Kane-Kendall County Mental Health Center requesting only that we write a letter explaining to the court why he attempted to commit the rape for which he is accused. It was explained to him that we could not perform such an action, that our purpose was only to evaluate his need of [h]ospitalization and if needed, provide that treatment. Mr. Whitehead indicated his disappointment, saying that it was for this reason that he had admitted himself."

The knife attacks referred to in the reports of the defendant's hospital stay in 1975 went uncorroborated at the sentencing hearing in this case, although the defendant was shown to have committed other acts of molestation. At the sentencing hearing, two witnesses recounted that the defendant had fondled them in 1981 while babysitting for them; at the time of that occurrence the girls were five and seven years old. Moreover, one of the defendant's sisters testified that the defendant had raped her repeatedly over a long period of time and had

threatened to kill her if she told anyone about it. Finally, the defendant, in his testimony at the sentencing hearing, admitted molesting his sister but denied raping her. During cross-examination, the defendant also admitted making the statements in 1975 regarding his long history of attacks on girls in secluded areas. The defendant explained the psychological pattern that accompanied those occurrences. The same information was also relied on by the defendant's expert witness, Dr. Marvin Ziporyn, in his analysis of the defendant's behavior. Moreover, defense counsel referred to it in closing argument at the sentencing hearing. Counsel argued that the defendant's earlier request for help had gone unheeded—that the defendant sought treatment in 1975 for his problems but had been turned away.

That the trial judge considered the uncorroborated evidence of the attacks was apparent in his explanation for sentencing the defendant to death. The trial judge said:

> "For many years, the defendant—by his own admissions which appear in this record—has sexually abused other young girls, often while assaulting them with a knife. ***
>
> * * *
>
> The list of the defendant's crimes are countless because—by his own words which appear in this record—he sought his young victims along railroad tracks, lonely parks and other remote places where he carried out his sexual attacks while wielding a knife, and then frightened the little girls so they would not reveal what had happened.
>
> * * *
>
> *** [B]ased upon all the evidence, and based particularly on the cruelty of Vicki[e] Wrobel's death and based on the many crimes of the defendant, particularly his sex crimes, his knife assaults and his crimes of arson—the

> Court is impelled toward the conclusion that the proper sentence for John Whitehead is death."

The defendant argues that a new sentencing hearing is required because the trial judge's decision to impose the death penalty rested, in part, on that unreliable evidence.

At the second part of a death penalty hearing the rules of evidence are in general suspended, and the only remaining restrictions are that the evidence be relevant and reliable. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(e); *People v. Free* (1983), 94 Ill. 2d 378, 422.) Although the evidence of the other crimes was uncorroborated and lacking in detail, there was nothing inherently unbelievable about the information. That an uncorroborated confession cannot by itself support a conviction (*People v. Neal* (1985), 111 Ill. 2d 180; *People v. Lambert* (1984), 104 Ill. 2d 375; *People v. Willingham* (1982), 89 Ill. 2d 352) did not preclude the use of this evidence at the defendant's sentencing hearing. A similar question arose in *People v. Devin* (1982), 93 Ill. 2d 326. In *Devin* evidence was introduced at the second part of a capital sentencing hearing of statements made by the defendant describing various murders and tortures that he had bragged of committing. The court noted:

> "The jury heard the testimony concerning conversations with defendant without being given a cautionary instruction that there was no corroborating evidence which tended to prove that any of the conduct described had in fact occurred. The jury was given no guidance that would assist them in the determination of whether the conversations to which the witnesses testified purported to recount actual occurrences or whether they were pure fantasy. Absence of such guidance would permit the jury to reach a conclusion as to defendant's 'character and propensities,' not on the basis of his conduct, but on the basis of his sociopathic fantasies." (93 Ill. 2d 326, 349.)

Thus, *Devin* did not hold that the evidence was inadmissible, but rather that its use should be carefully guided.

The sentencing hearing in this case was held before the trial judge alone, and it may be assumed that he viewed the uncorroborated evidence in this case with the necessary caution and took care to base his decision on competent evidence that he believed to be reliable, from the evidence presented. (See *People v. Hall* (1986), 114 Ill. 2d 376, 419; *People v. Grabowski* (1957), 12 Ill. 2d 462, 467.) The defendant argues that the trial judge's treatment of the evidence was inconsistent, however, for he rejected the exculpatory aspect of the statements— that the defendant was afflicted with a mental disorder that manifested itself in advance of the attacks—but used the inculpatory aspect—that the attacks occurred. We do not believe that the two aspects were so closely connected that the trial judge used the information in an illogical way. During his hospital stay in 1975 the defendant explained that the events underlying the charges pending at that time were different from his normal pattern: the victim was an adult, whom he knew, and he had actually used the knife, cutting her on the hand with it. A more obviously invented history would have matched, in greater detail, the circumstances of the pending charges. Moreover, the testimony at the sentencing hearing tended to show that the defendant had committed acts of molestation, and he admitted having abused one of his sisters, who testified. As we have said, there was nothing inherently unreliable about the evidence, and we cannot say that the trial judge erred in using the information as one of the grounds for his decision to impose the death penalty.

The defendant also argues that statements he made in two court-ordered interviews were inadmissible because in neither case was there any showing that he had

been advised of his constitutional right against self-incrimination. (See *Estelle v. Smith* (1981), 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866.) The statements in question were made during an examination conducted in March 1983 by Dr. Werner Tuteur, the psychiatrist who testified in the State's behalf at the sentencing hearing, and during an examination conducted by M. F. Chiapetta, a clinical psychologist who examined the defendant by court order in July 1975. The statements appear in reports made by Tuteur and Chiapetta, and they were admitted without objection at the sentencing hearing.

The defendant complains of two specific statements that, he says, are not duplicated in any other evidence introduced at the sentencing hearing. The defendant first cites the following, which is found in the report made in March 1983 by Dr. Tuteur:

> "*History of Sexual Aberrations*: At age 11 he would insert a finger into the vagina of a large female dog; soon later at the age of 12 his first heterosexual intercourse took place with an aunt, 21 years old. During his teen years he frequently practiced voyeurism (peeping Tom) and soon later he had children take his penis into their mouth. This practice has continued during his entire life span. He would also frequently insert his tongue into the vagina of female children (cunnilingus). Admittedly he was usually intoxicated during such incidents. There is no history of exhibitionism."

From the report of M. F. Chiapetta, made in July 1975, the defendant complains of the following:

> "He also related how while in the Armed Services he had a twelve year old girl masturbate him while he held her at knife point. ***
>
> Mr. Whitehead stated that all of his victims were approximately twelve years of age and that he selected that age group because he feels they can do what he wants them to do, masturbate him and/or commit oral copula-

tion on him, but also 'have sense enough to be scared and shut up.' "

The defendant believes that the trial judge's reliance on these particular statements is apparent from his findings that the defendant "frightened the little girls so they would not reveal what had happened," that the defendant "coldly and calculatedly carried out his crimes," and that the defendant killed the victim here with "characteristic" shrewdness and calculation. Citing *United States v. Cohen* (5th Cir. 1976), 530 F.2d 43, the defendant contends that the State could present expert testimony regarding his psychological condition but could not introduce into evidence any specific statements made by him that were not preceded by *Miranda* warnings.

The question of the admissibility of the quoted statements may be considered waived, for as the defendant acknowledges, no objection was made in the trial court to the admission of those materials into evidence. (See *People v. Devin* (1982), 93 Ill. 2d 326, 344.) The defendant argues, however, that the introduction of the statements was plain error, and alternatively that counsel was ineffective for failing to preserve the question for review.

The statements complained of do not reveal much more than what was shown by evidence whose admissibility the defendant does not contest. Similar statements were contained in reports made in connection with the defendant's voluntary commitment to Elgin State Hospital in June 1975. As noted earlier, those reports disclosed that the defendant admitted to a lengthy history of molesting adolescent girls at knifepoint. Several of the defendant's victims testified at the sentencing hearing.

In *Estelle v. Smith* (1981), 451 U.S. 454, 468, 68 L. Ed. 2d 359, 372, 101 S. Ct. 1866, 1876, the Supreme Court held: "A criminal defendant, who neither initiates

a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing hearing." Here, the defendant made his psychological condition an issue at the sentencing hearing, and therefore he may be considered to have waived any objection to the introduction of relevant information on that question. (*People v. Lyles* (1985), 106 Ill. 2d 373, 417.) Moreover, Dr. Tuteur's report said: "[The defendant] was fully informed that the examination about to begin is based on a State Motion whereby the Defendant is ordered to submit to this examination. He was also told that a report reflecting result and findings would be submitted to the State's Attorney. All this he fully understood." It should also be noted that the report of the defendant's expert witness, Dr. Ziporyn, indicated that he relied on clinical studies supplied by Chiapetta, apparently a reference to the report Chiapetta made in July 1975. The concern in *Cohen*, cited by the defendant, went to statements about the offense itself and would not apply in this case; here, the statements did not concern the murder of which the defendant had been convicted, and we do not believe that they were inadmissible.

The defendant also argues that the trial judge erred in denying a discovery request made by defense counsel at the outset of the sentencing hearing. On that occasion counsel asked that the State be ordered to disclose any mitigating evidence in its knowledge or possession, and the defendant believes that the court's failure to make that order was improper. (See *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194; 87 Ill. 2d R. 412(c).) The defendant does not say what mitigating evidence, if any, the State might have had that was unknown to defense counsel.

At the sentencing hearing, in response to defense counsel's request, the State's Attorney disputed the applicability of the discovery rules to a capital sentencing hearing but went on to say, "I have no problems. There is a one-page report and then there is a two- or three-page statement from one of the witnesses—"; later, the State's Attorney said, "Your Honor, despite the fact that the Supreme Court has held to the contrary, we will tender to the defense counsel any documents which we have that pertain to anything in the hearing on aggravation." The defendant believes that the latter statement, with its reference to "anything in the hearing on aggravation," meant that only aggravating evidence would be revealed. That interpretation ignores the context in which the remark was made. Although the State's Attorney did not believe that the discovery rules were applicable in the sentencing proceeding, he agreed to provide defense counsel with the information they sought. In light of the apparent willingness of the State to divulge the material in its knowledge or possession, we construe the prosecutor's reference to "the hearing on aggravation" as a shorthand name for the hearing on aggravation and mitigation, the second part of the bifurcated sentencing hearing. We conclude that the State agreed to provide the defendant with whatever information it had, and accordingly the defendant could not have been prejudiced by the trial court's failure to compel disclosure.

The defendant also argues that the trial judge erred in permitting the State to cross-examine the defendant's expert witness, Dr. Marvin Ziporyn, regarding his professional opinion in an unrelated case. The other case involved Richard Speck, and it appears from the cross-examination in this case that Dr. Ziporyn had concluded that Speck was insane. The defendant contends that the

State's inquiry on that matter was an irrelevant attack on the witness' credibility.

Although the trial judge was not convinced by Dr. Ziporyn's testimony, the witness' opinion regarding Speck's sanity did not play a part in that decision. The trial judge explained:

"As to the testimony of Dr. Ziporyn, his opinions are not supported by convincing detail. On cross-examination, Dr. Ziporyn was asked if his opinion as to the defendant's mental condition would change if the Doctor took into account certain facts—all facts appearing in the record or readily inferred from other facts in the record. In each case, Dr. Ziporyn said the facts would not change his opinion. It appears to the Court that Dr. Ziporyn reached his opinion and clung to it in spite of the facts and not because of the facts.

The Court finds that Dr. Ziporyn is not a credible witness and his opinion is entitled to little weight."

Thus, even if the inquiry into Dr. Ziporyn's opinion in the Speck case was irrelevant, the trial judge did not rely on that as reason for believing instead the State's expert witness, Dr. Tuteur.

The defendant also makes a number of challenges to the constitutionality of the Illinois death penalty statute. First, he argues that the statute violates the eighth and fourteenth amendments of the Federal Constitution (U.S. Const., amends. VIII, XIV) because the death penalty may not be imposed on those who are rendered fit to stand trial only through the aid of certain special assistance. Under the statutory provisions in question, a person is unfit to stand trial "if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." (Ill. Rev. Stat. 1981, ch. 38, par. 104—10.) Section 104—22 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 104—22) provides:

"(a) On motion of the defendant, the State or on the court's own motion, the court shall determine whether special provisions or assistance will render the defendant fit to stand trial as defined in Section 104—10.

(b) Such special provisions or assistance may include but are not limited to:

(1) Appointment of qualified translators who shall simultaneously translate all testimony at trial into language understood by the defendant.

(2) Appointment of experts qualified to assist a defendant who because of a disability is unable to understand the proceedings or communicate with his or her attorney."

Section 104—26(b) provides that "[a] defendant convicted following a trial under Section 104—22 shall not be subject to the death penalty." (Ill. Rev. Stat. 1981, ch. 38, par. 104—26(b).) The defendant argues that the special exemption for defendants tried under those procedures is selective and arbitrary.

As this court explained in *People v. Stewart* (1984), 104 Ill. 2d 463, the statutory provisions in question relate not to providing translators for foreign-speaking defendants, whose needs are addressed elsewhere (see Ill. Rev. Stat. 1981, ch. 38, pars. 165—11 through 165—13), but rather to reducing, if not eliminating, more fundamental barriers to communication. Special communicative assistance of the type envisioned by section 104—22 would enable an accused, who was otherwise unfit to stand trial, to comprehend the proceedings and to assist in the preparation and presentation of a defense. "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind" (*Furman v. Georgia* (1972), 408 U.S. 238, 306, 33 L. Ed. 2d 346, 388, 92 S. Ct. 2726, 2760 (Stewart, J., concurring)), however, and accordingly the exemption from capital punishment of a person tried under the special provisions reflects twin concerns: that the result of a trial might not

be a sufficiently reliable predicate for a sentence of death, and, similarly, that the communicative assistance envisioned by the statute might be inadequate to meet the unique demands of a capital sentencing hearing. The special exemption from capital punishment of persons tried under that regimen does not render the death penalty statute unconstitutional.

The defendant also asks the court to reconsider its holding in *People v. Albanese* (1984), 104 Ill. 2d 504, that the death penalty statute is not unconstitutional for failing to require the sentencer to determine that death is the "appropriate" punishment, in addition to making the other determinations required by statute. In *Albanese* the court explained that to require a specific finding that the death penalty is appropriate in a given case could jeopardize the constitutionality of the sentencing scheme: "appropriateness" is a vague term, the court explained, and a separate decision regarding the appropriateness of the penalty could invite its imposition in an arbitrary and capricious manner. (104 Ill. 2d 504, 536-37.) Moreover, the determinations required by the statute—that an aggravating circumstance exists, and that the evidence in mitigation is not sufficient to preclude imposition of a sentence of death—are intended to produce or yield what may be termed the appropriate sentence in a particular case. (*People v. Morgan* (1986), 112 Ill. 2d 111, 147.) Relevance and reliability are the limits on the introduction of evidence at the second part of the sentencing hearing (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(e); *People v. Free* (1983), 94 Ill. 2d 378, 422), and a defendant must be permitted broad range in presenting evidence in mitigation (*Skipper v. South Carolina* (1986), 476 U.S. 1, 90 L. Ed. 2d 1, 106 S. Ct. 1669; *Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869; *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954). We conclude that a separate decision regarding the

"appropriateness" of the penalty, apart from what the statute now requires, is unnecessary: it would retrace and reexamine matters already considered and determined or, worse, divert the sentencer's attention to a standardless inquiry. For these reasons we decline to depart from the result reached in *Albanese*.

The defendant also makes the argument that the Illinois death penalty statute fails to narrow to a unique and cognizable class those persons who are eligible for capital punishment. The defendant observes that the same statutory aggravating circumstances that may make a defendant eligible for the death penalty (see Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)) also serve as the criteria on which a defendant may be sentenced to a term of natural life imprisonment. The defendant contends that the use of the same sentencing criteria for both functions violates the rule expressed in *Zant v. Stephens* (1983), 462 U.S. 862, 877, 77 L. Ed. 2d 235, 249-50, 103 S. Ct. 2733, 2742, that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."

Section 5—8—1(a) of the Unified Code of Corrections provides, in pertinent part:

"A sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:

(1) for murder, \*\*\* (b) if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or that any of the aggravating factors listed in subsection (b) of Section 9—1 of the Criminal Code of 1961 are present, the court may sentence the defendant to a term of natural life imprisonment \*\*\*." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a).)

The defendant contends that the use of the same statutory aggravating circumstances for both penalties eliminates any meaningful distinction between those persons who are eligible for the death penalty and those who, under section 5—8—1(a)(1)(b), may instead be sentenced to a term of natural life imprisonment.

This argument proves too much. An aggravating circumstance could perform the function demanded of it by the defendant only if it invariably resulted in imposition of the death penalty. Mandatory death sentences have generally been rejected, however, except possibly for those who commit murder while serving life prison terms. (*Roberts v. Louisiana* (1977), 431 U.S. 633, 637 n.5, 52 L. Ed. 2d 637, 642 n.5, 97 S. Ct. 1993, 1995 n.5 (*per curiam*); *Roberts v. Louisiana* (1976), 428 U.S. 325, 49 L. Ed. 2d 974, 96 S. Ct. 3001; *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978.) The Illinois statute is not a mandatory penalty, and the decision to impose a sentence of death in a particular case does not depend solely or entirely on the existence of a statutory aggravating circumstance. Once it is determined that at least one of the aggravating circumstances exists, making the defendant eligible for the death penalty, a separate determination must then be made whether the death sentence should be imposed.

The concern expressed in *Zant* was to prevent the arbitrary and capricious imposition of the death penalty, and was aimed at aggravating circumstances that failed to demarcate, in a meaningful way, a group of murders for which death could be the proper punishment. Thus, *Zant's* command is satisfied by ensuring that an aggravating circumstance is not so vague and general that it fails to channel the sentencing authority's discretion. *Zant* does not prevent the use of the aggravating circumstance for other purposes. The defendant's argument would appear

also to implicate the prosecutor's discretion in deciding whether to seek a sentence of death in a particular case, but the defendant insists that his argument here is not an attack on that feature of the Illinois death penalty scheme, a feature that has previously withstood challenge (see *People v. Lewis* (1981), 88 Ill. 2d 129; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531). That the same aggravating circumstances are used for determining both eligibility for the death penalty and eligibility for natural life imprisonment does not, in our view, mean that the death penalty statute fails to narrow to a unique and cognizable scope those persons who are eligible for capital punishment.

This court has also rejected the defendant's argument that the sentencing provision unconstitutionally places on the defendant the burden of persuasion on the question whether sufficient mitigating circumstances exist to preclude imposition of the death penalty. (*People v. Caballero* (1984), 102 Ill. 2d 23, 49.) The defendant also argues that the Illinois death penalty statute lacks adequate safeguards to prevent the arbitrary or capricious imposition of the death penalty. In this regard the defendant complains of the prosecutor's discretion in determining whether to seek the death penalty in a particular case, the limited comparative proportionality review made by this court in reviewing death sentences, the absence of a requirement that the sentencing authority provide a written statement of its findings, the absence of a requirement that the State provide pretrial notice of its aggravating evidence, and the failure to impose on the State a burden of persuasion at the second part of the sentencing hearing. The defendant recognizes, however, that these arguments have been rejected previously (*People v. Albanese* (1984), 104 Ill. 2d 504, 540-42), and we decline to reconsider those determinations.

Finally, the trial judge believed that the defendant's conviction for aggravated kidnaping was for a Class X felony and sentenced him to 30 years' imprisonment for that offense. The defendant and the State agree, however, that the offense was in this case a Class 1 felony (Ill. Rev. Stat. 1981, ch. 38, par. 10—2(b)(2)); the maximum prison term for a Class 1 felony is 15 years (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(4)). Moreover, an extended term is available only for the most serious crime for which a defendant is convicted (*People v. Jordan* (1984), 103 Ill. 2d 192), and therefore the 30-year term cannot stand on that theory. Accordingly, the defendant's sentence for his conviction for aggravated kidnaping is modified to 15 years' imprisonment. See 87 Ill. 2d R. 615(b).

For the reasons stated, the defendant's convictions are affirmed. We affirm the defendant's sentence of death and modify his sentence for aggravated kidnaping to 15 years' imprisonment. The clerk of this court is directed to enter an order setting Tuesday, May 12, 1987, as the date on which the sentence of death, entered in the circuit court of Grundy County, is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is confined.

*Judgment affirmed,*
*as modified.*

JUSTICE SIMON, concurring in part and dissenting in part:

The defendant has been sentenced to death on the basis of unreliable, out-of-court declarations which there is every reason to believe were fabricated by the defendant

in an abortive attempt to excuse prior alleged misconduct. Although I concur in my colleagues' decision affirming the defendant's convictions for murder and aggravated kidnaping, I cannot agree with their decision to affirm his death sentence. I dissent both because defendant's death penalty is premised upon untrustworthy evidence and because the Illinois death penalty statute is, in my opinion, unconstitutional. (See *People v. Albanese* (1984), 104 Ill. 2d 504, 549 (Simon, J., concurring in part and dissenting in part); *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part); *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting). See also *United States ex rel. Lewis v. Lane* (C.D. Ill. Jan. 8, 1987), No. 86–2086, slip op. at 29 (expressing "grave doubt" over the constitutionality of the Illinois death penalty statute); Note, *Stare Decisis and the Illinois Death Penalty*, 1986 U. Ill. L. Rev. 177.) In addition, I would supplement the discussion in *Albanese, Silagy* and *Lewis* regarding the role of *stare decisis* in determining the constitutionality of our death sentence statute by noting the following: the Supreme Court overruled or qualified its prior constitutional decisions at least 28 times by 1932 (*Burnet v. Coronado Oil & Gas Co.* (1932), 285 U.S. 393, 406 n.1, 76 L. Ed. 815, 823 n.1, 52 S. Ct. 443, 447 n.1 (Brandeis, J., dissenting)), between 1937 and 1949 the court overruled 21 of its earlier opinions on constitutional law (Douglas, *Stare Decisis*, 49 Colum. L. Rev. 735, 743 (1949)), and in the 1960s and 1970s the Supreme Court reversed its own constitutional rulings 47 times (Maltz, *Some Thoughts on the Death of Stare Decisis in Constitutional Law*, 1980 Wis. L. Rev. 467, 467).

The sentencing judge justified his decision to sentence the defendant to death in part by giving credence to the defendant's 1975 statements that he had on very many occasions, commencing when he was 14 years old, sexu-

ally assaulted girls of about 12 years of age while armed with a knife. In explaining the sentence he imposed, the judge made it clear, as the majority opinion concedes (116 Ill. 2d at 453), that he was relying on these statements.

"For many years, the defendant—by his own admissions which appear in this record—has sexually abused other young girls, often while assaulting them with a knife. ***

* * *

*** [B]ased upon all the evidence, and based particularly on the cruelty of Vicki[e] Wrobel's death *and based on the many crimes of the defendant, particularly his sex crimes, his knife assaults* and his crimes of arson—the Court is impelled toward the conclusion that the proper sentence for John Whitehead is death." (Emphasis added.)

The statements upon which the judge relied are found in psychiatric records appended to the presentence report.

In 1975, at the age of 25, the defendant was charged with attempted rape and aggravated battery. He voluntarily admitted himself to a psychiatric-care facility with the apparent purpose of fabricating an insanity defense to those charges (for which he was eventually acquitted without raising an insanity defense); notations in the defendant's records from the Department of Mental Health describe the defendant's preoccupation with the legal rather than medicinal ramifications of his hospitalization:

"the possibility of discharge with continuing treatment (desensitization) with outpatient services, was described. John's immediate reaction was negative — John fears that outpatient treatment will be less helpful in court.
***

He went along with the idea of discharge and linkage to the Kane-Kendall County Mental Health Center requesting only that we write a letter explaining to the

Court why he attempted to commit the rape for which he is accused. It was explained to him that we could not perform such an action, that our purpose was only to evaluate his need of Hospitalization and if needed, provide that treatment. Mr. Whitehead indicated his disappointment, saying that it was for this reason that he had admitted himself."

Notwithstanding those reasons to discount the credibility of any statements made by the defendant during that 1975 hospital stay, the sentencing judge imposed the death sentence, relying, in part, upon the accuracy of defendant's 1975 admissions that he had for years attacked girls of about 12 years of age whom he encountered in various secluded areas (along railroad tracks and in parks and abandoned fields), forcing them at knife point to engage in various sex acts with him. The defendant made those admissions in 1975 to substantiate his claim that the conduct for which attempted-rape and aggravated-battery charges were pending had been caused by a "feverish" feeling that developed over a period of days and which was only relieved by a violent sexual assault the defendant could not later remember, and the defendant made the same claim at his sentencing hearing in this case.

During the sentencing hearing, the defendant presented the testimony of a psychiatrist who believed that defendant's conduct and fever attacks were caused by temporal-lobe epilepsy; but the sentencing judge explicitly rejected both the expert's opinion and the defendant's claim that his attack against Vickie Wrobel was preceded by a "feverish" feeling and followed by loss of memory. Thus, the sentencing judge rejected portions of the 1975 statements regarding fevers and amnesia while accepting as true portions of the same statements wherein the defendant had made wholly uncorroborated

claims of his many sexual assaults against 12-year-old girls while armed with a knife.

The majority does not believe that the two aspects of defendant's statements were so connected that the judge could not logically accept one without the other. (116 Ill. 2d at 455.) That observation may be accurate, but it misses the point that not a scintilla of evidence was ever presented to substantiate the 1975 statements regarding knife attacks. Instead, there was reason to believe that they were concocted to support an insanity defense which never materialized. The statements were, therefore, not sufficiently reliable to warrant their consideration as evidence in aggravation. See *People v. Devin* (1982), 93 Ill. 2d 326.

Although the defendant seemed to again admit to having committed those sexual assaults when, during cross-examination by the State at the sentencing hearing, the defendant testified that those offenses referred to in his 1975 statements were committed to satisfy his sexual appetite and alleviate the "feverish" feeling, it must be remembered that defense strategy during the sentencing proceedings was to portray defendant's murder of Vickie Wrobel as the result of an organic brain dysfunction (temporal-lobe epilepsy). To have denied the 1975 statements, originally made to substantiate defendant's claimed psychopathology, would only have served to undermine this insanity strategy. Thus, defendant's admissions in 1975 cannot be regarded as corroborated by later testimony, given that identical pressures to fabricate were present, which is to say that earlier uncorroborated admissions are not substantiated by additional uncorroborated admissions.

This case clearly demonstrates the dangers inherent when confessions of previous crimes are considered to support the imposition of capital punishment even though there is no evidence, independent of the defend-

ant's admissions, which tends to establish that any of those crimes were ever actually perpetrated. The majority opinion concludes that there was "nothing inherently unreliable about the evidence" (116 Ill. 2d at 455), but it seems to me that the majority has gotten the question backwards by failing to inquire whether there was any reason to view the statements as believable. It strains the imagination to believe that the defendant, from the age of 14 until the age of 25, in 1975, committed numerous sexual assaults (the exact number being unspecified) against girls about 12 years old in parks and abandoned fields and alongside railroad tracks in the populous areas where he lived, while armed with a knife, and not a single one of the supposed victims or their parents filed a complaint or otherwise caused an investigation to be initiated by which prosecutors in this case could have established names of victims, dates or places of attacks, or other corroborating evidence to prove that even one of those assaults actually occurred. The deficiency here is that the sentencing judge relied on a record which is entirely devoid of evidence detailing how many girls were assaulted, when and where, or the circumstances surrounding any one of those confessed assaults. In view of his clear explanation as to the matters he relied upon in imposing the death sentence, I do not attribute to the trial judge the "necessary caution" (116 Ill. 2d at 455) the majority does. On the contrary, the fact that the trial judge believed uncorroborated evidence of this type to be "reliable" for the purpose of imposing a death sentence belies the majority's assumption that he was guided by the "necessary caution" and "care." 116 Ill. 2d at 455.

It is axiomatic that a conviction may not stand on an accused's confession alone without evidence of the *corpus delicti*. (*People v. Lambert* (1984), 104 Ill. 2d 375.) "The corroboration requirement stems from an attempt to assure the truthfulness of the confession and recog-

nizes that the reliability of a confession 'may be suspect' " either because of coercion, confusion or reason to fabricate. (*People v. Willingham* (1982), 89 Ill. 2d 352, 359, quoting *Smith v. United States* (1954), 348 U.S. 147, 153, 99 L. Ed. 192, 199, 75 S. Ct. 194, 197.) Since uncorroborated statements cannot support a criminal conviction, *a fortiori* a decision that the defendant must forfeit his life cannot hang on so slender a strand of evidence. Other jurisdictions have recognized the risks encountered when confessions of other crimes are considered for purposes of sentencing (*e.g., United States v. Jones* (10th Cir. 1981), 640 F.2d 284; *People v. Hamilton* (1963), 60 Cal. 2d 105, 383 P.2d 412, 32 Cal. Rptr. 4), and at least one Federal court of appeals has ruled that if "the trial court had relied to a substantial degree on evidence of other crimes the defendant had, during his psychiatric examination, claimed to have committed, \*\*\* it would have been necessary for the evidence regarding those crimes to have been true and accurate." (*United States v. Jones* (10th Cir. 1981), 640 F.2d 284, 286.) A defendant's statements implicating himself in prior criminal conduct should not be admitted during a sentencing hearing unless those statements are corroborated by some independent evidence.

The majority finds what it considers sufficient corroboration for the 1975 admissions because there was evidence that the defendant had fondled two children, ages five and seven, while baby-sitting for them in 1981. It also says that the statements were corroborated by the testimony of the defendant's younger sister, who claimed that she had been sexually assaulted and raped by the defendant over a period of several years. None of those incidents corroborate defendant's 1975 admissions.

There is little similarity to be found between the supposed knife attacks, unspecified in number, against unidentified 12-year-old girls along railroad tracks and in

parks and abandoned fields, and the unarmed fondling six years later of two children, five and seven years old. Neither did the defendant's sister testify that the defendant had threatened her with a knife during any of the many assaults which she claimed the defendant had perpetrated against her. At most the State's evidence establishes the defendant's propensity to commit sexual offenses against young women and girls (in fact, the allegations of fondling in 1981 do not even establish propensity for the supposed crimes confessed to in 1975), and the mere propensity is not sufficiently probative to establish independently that the crimes admitted to in 1975 were ever committed in fact. In the absence of any independent evidence that those crimes were actually committed, I believe that the 1975 statements were erroneously relied upon by the sentencing judge in pronouncing sentence.

Citing *People v. Free* (1983), 94 Ill. 2d 378, 422, the majority says that this evidence was properly considered because the "rules of evidence are in general suspended [at the second part of a death penalty hearing], and the only remaining restrictions are that the evidence be relevant and *reliable.*" (Emphasis added.) (116 Ill. 2d at 454.) In *Free*, however, the court found that the evidence at issue "appeared trustworthy" (94 Ill. 2d 378, 423), an epithet hardly descriptive of the statements at issue in this case. While the trial judge may use evidence in the sentencing proceeding which is generally inadmissible during the guilt phase, "he must 'exercise care to insure the accuracy of information considered.' " (*People v. La Pointe* (1981), 88 Ill. 2d 482, 496, quoting *People v. Adkins* (1968), 41 Ill. 2d 297, 300.) This is not the first case to demonstrate that the court, "while continuing to pay lip service to this principle, has effectively pulled the teeth from the reliability standard." *People v. Morgan* (1986), 112 Ill. 2d 111, 152 (Simon, J., dissenting).

The majority opinion diverts attention from the problem confronting the court by transforming the question of whether the sentencing judge placed too much reliance on unsubstantiated admissions (the issue actually presented) into a question of whether the evidence was admissible in a proceeding where the rules of evidence have been "suspended." The defendant's 1975 admissions to mental health professionals whom, the majority concedes, the defendant was apparently attempting to manipulate for the benefit of his criminal defense in 1975 are incredible on their face, and they were made under circumstances which strongly suggest that they were fabricated. Affirming a death sentence premised on statements as unreliable as these indicates that the court has now modified its rule in *Free* to suspend more than just the rules of evidence.