(No. 62785.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILLIAM CREWS, Appellant.

*Opinion filed February 11, 1988.—Rehearing denied May 31, 1988.*

CLARK, J., joined by WARD, J., concurring.

SIMON, J., dissenting.

Charles M. Schiedel, Deputy Defender, and Robert E. Davison, Peter L. Rotskoff and Robert D. Seeder, Assistant Defenders, of the Office of the State Appellate Defender, of Springfield, and Karen McNaught, law student, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Mark L. Rotert, Arleen Anderson and Scott Graham, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

The defendant, William Crews, pleaded guilty but mentally ill to one count each of murder and attempted murder in the circuit court of Randolph County. The trial judge sentenced the defendant to death for the murder conviction and imposed a 30-year prison term for the conviction for attempted murder. The defendant's execution was stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d Rules 603, 609(a).

The defendant's convictions stem from his attack on two correctional officers at Menard Correctional Center

on November 30, 1984. The defendant was an inmate of Menard at the time of the offenses and was serving a 20-to-60-year term for an earlier murder conviction. The attack occurred on the gallery outside the defendant's cell. The defendant stabbed correctional officer Cecil Harbison to death with a shank and wounded another guard, Lamont Gilbert. The defendant then fled from the gallery, and he was captured moments later on the ground floor of the cellhouse.

The defendant initially pleaded not guilty to the charges here, but he later asked to change his plea to guilty but mentally ill (GBMI). As required by statute (see Ill. Rev. Stat. 1983, ch. 38, pars. 113—4(d), 115—2(b)), the trial judge ordered the defendant to undergo a psychological examination, and a hearing was held in August 1985 on the defendant's mental condition. At the hearing, defense counsel presented the testimony of three psychiatrists—Drs. Pichardo, Vallabhaneni, and Parwatikar—who had treated the defendant at Menard Correctional Center or Menard Psychiatric Center. Dr. Pichardo first saw the defendant in February 1980 and last saw him in the middle of September 1984, a little more than two months before the defendant's attack on the two guards. Dr. Pichardo believed that the defendant was suffering from a mental illness during that period, but he could not say whether the defendant had a judgment-impairing, substantial disorder of thought, mood, or behavior. According to Dr. Pichardo, the defendant had attempted to commit suicide in April 1980.

Dr. Vallabhaneni saw the defendant several days after his attack on the guards and believed that at the time of the offenses the defendant was suffering from a mental illness and that his judgment was impaired, but he did not have a specific diagnosis for the defendant's condition.

Dr. Parwatikar believed that at the time of the offenses the defendant was mentally ill, in that he had a

substantial disorder of mood, thought, or behavior. Dr. Parwatikar saw the defendant on December 2, 1984, two days after the offenses here, and his diagnosis then was of an intermittent explosive disorder.

The State disputed the defendant's contention that he was mentally ill at the time of the offenses. Dr. Daniel Cuneo, a clinical psychologist, testified in the State's behalf at the hearing. Dr. Cuneo had interviewed the defendant on two occasions—in March 1985 and in August 1985—and, based on those examinations, as well as on his review of the defendant's records, Dr. Cuneo concluded that the defendant was malingering and that he had an antisocial personality disorder. Dr. Cuneo believed that the defendant was only feigning mental illness.

The State also introduced into evidence statements the defendant made to authorities concerning the offenses here. In an initial statement given on the night of his attack on the two guards, the defendant said simply that he had gone berserk, and he did not provide a motive for his acts. In a statement given the next day, however, the defendant explained that he attacked the officers because he resented an order Harbison had given him shortly before that. The State also presented testimony from two inmates who spoke with the defendant in the period following his attack on the two guards. They testified that the defendant told them that he was trying to convince psychiatrists that he was crazy. Also, one of the inmates recalled that on the day of the occurrence here the defendant mentioned the name of a friend who had been killed earlier that year and made a comment suggesting that the friend's death should be avenged. Finally, the State presented evidence of the defendant's extensive history of disciplinary violations since 1974, when he began serving the prison sentence for his earlier murder conviction. These disciplinary tickets included 16 violations of rules, 10 assaults, 5 instances of damaging property, 19

instances of disobeying orders, and 11 instances of possession of contraband or dangerous weapons.

The trial judge accepted the defendant's GBMI plea, finding that there was a factual basis that the defendant was mentally ill when he committed the offenses here. The State then requested a death penalty hearing, and the defendant waived his right to a jury for that purpose. The defendant, who was born in 1952 and therefore 18 or older at the time of the offenses, was eligible for the death penalty because the murder victim was a correctional officer. See Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(2).

Dr. Cuneo testified in the State's behalf at the sentencing hearing, and he repeated his earlier diagnosis that the defendant had an antisocial personality disorder. Dr. Cuneo did not believe that the defendant was functioning under an extreme mental or emotional disturbance at the time of the offenses. Dr. Cuneo also said that he was familiar with capital sentencing in Illinois and that he did not know of any case in which a defendant received the death sentence after being found guilty but mentally ill. A victim impact statement by Debra Harbison, widow of the slain guard, was read into the record by a Department of Corrections investigator. Finally, the State presented testimony concerning the defendant's conviction for murder in Logan County in 1973, for which he was serving a 20-to-60-year sentence at the time of the offenses here. On that occasion, the defendant shot his stepfather in the head with a rifle; the apparent motive for the crime was the filing of a battery charge by the murder victim against the defendant.

The defendant did not present any testimony at the sentencing hearing. Included in a presentence investigation report, however, was a report dated August 5, 1985, by a psychiatrist, Dr. Moisy Shopper, who had examined the defendant and reviewed his prison file. Dr. Shopper

described the defendant's suicide attempt in April 1980 and noted parallels between that event and the defendant's later attack on the two guards. Also, Dr. Shopper described the defendant's condition at the time of the offense as "an acute paranoid psychotic state with marked depressive features."

The trial judge sentenced the defendant to death for the murder conviction. The trial judge did not believe that imposition of the death penalty was precluded by the defendant's GBMI plea. The trial judge found that the defendant had a significant history of criminal conduct, and he did not believe that the defendant was acting under the influence of an extreme mental or emotional disturbance sufficient to preclude imposition of the death penalty. Also, the trial judge sentenced the defendant to a 30-year prison term for the conviction for attempted murder, to be served consecutively to any other sentence of imprisonment.

I

The defendant first argues that the legislature did not intend the death penalty to be available as a possible punishment for GBMI offenders. The defendant also argues that sentencing a GBMI offender to death would be excessive punishment and therefore is forbidden by the eighth amendment. Finally, the defendant contends that the trial judge, in imposing the death penalty, ignored certain factual findings that he had made earlier in accepting the GBMI plea.

We note at the outset the State's argument that all the defendant's contentions in this appeal may be deemed waived because defense counsel failed to file a post-trial motion after the conclusion of the death penalty hearing. This court has previously held that a post-trial motion should be filed to preserve issues in a capital case. (See *People v. Szabo* (1986), 113 Ill. 2d 83, 93-94;

*People v. Caballero* (1984), 102 Ill. 2d 23, 31-33.) "The waiver rule is one of administrative convenience rather than jurisdiction, however" (*People v. Smith* (1985), 106 Ill. 2d 327, 333), and is not a complete bar to review; "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court" (107 Ill. 2d R. 615(a)). Moreover, our constitutional obligation to review cases in which the death penalty has been imposed (see Ill. Const. 1970, art. VI, §4(b)) would be "meaningless" (*People v. Caballero* (1984), 102 Ill. 2d 23, 32) if the failure to file a post-trial motion necessarily meant that every issue must be considered waived. In this case, the defendant's convictions are based on a guilty plea, and his capital sentencing hearing was conducted without a jury. During those proceedings, the trial judge was made aware of a number of the defendant's contentions of error, and the trial judge ruled on the questions. With respect to the few allegations of error that are raised here but that were not brought to the trial judge's attention, the defendant makes the additional argument that the failure to register a contemporaneous objection constituted ineffective assistance of counsel. In those instances, we may properly inquire whether there was in fact an error to which an objection should have been made. Our concern here is to "promote judicial economy and finality of judgments" while "protecting the integrity of the judicial system and the rights of criminal defendants." (*People v. Enoch* (1988), 122 Ill. 2d 176, 190.) Our review of the defendant's contentions of error in this case will be guided by those principles.

The defendant argues that the legislature did not intend for the death penalty to be available as a possible punishment for GBMI offenders. In support of this argument, the defendant relies on section 5—2—6 of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38,

par. 1005—2—6). Section 5—2—6 bears the heading "Sentencing and Treatment of Defendant Found Guilty but Mentally Ill," and the defendant contends that certain provisions in the statute signify the legislature's intent to preclude the death penalty as a possible punishment for GBMI offenders.

The defendant argues that section 5—2—6 lists the possible sentences that may be imposed on one who has been found guilty but mentally ill and that the death penalty is not included in that list. The defendant also contends that several requirements of section 5—2—6 are inconsistent with the procedures followed in death penalty hearings. For example, section 5—2—6(a) provides that the trial judge is to order the preparation of a presentence investigation report following a GBMI finding, but one is not required in a death penalty proceeding (*People v. Gaines* (1981), 88 Ill. 2d 342, 372-73). Also, section 5—2—6(a) provides that *"[t]he court* may impose any sentence upon the defendant which could be imposed pursuant to law upon a defendant who had been convicted of the same offense without a finding of mental illness." (Emphasis added.) (Ill. Rev. Stat. 1983, ch. 38, par. 1005—2—6.) Although the language allowing the imposition of "any sentence" is seemingly contrary to the defendant's position here, the defendant believes that the provision reserves the sentencing function to the trial judge and that it therefore cannot be squared with the role that a jury may play at a capital sentencing hearing. The defendant also argues that the death sentence would be incompatible with the treatment alternatives that are prescribed for GBMI offenders. Section 5—2—6(b) (Ill. Rev. Stat. 1983, ch. 38, par. 5—2—6(b)) directs the Department of Corrections to provide psychological help to GBMI offenders who are sentenced to terms of imprisonment. Under that provision, the Department is to "cause periodic inquiry and examination

to be made concerning the nature, extent, continuance, and treatment of the defendant's mental illness. The Department of Corrections shall provide such psychiatric, psychological, or other counseling and treatment for the defendant as it determines necessary." Similarly, section 5—2—6(e)(1) requires that GBMI offenders who are placed on probation or who are sentenced for a term of periodic imprisonment or a period of conditional discharge "submit to a course of mental treatment prescribed by the sentencing court." (Ill. Rev. Stat. 1983, ch. 38, par. 1005—2—6(e)(1).) The defendant concludes that sentencing a GBMI offender to death would be contrary to the statutory scheme. See Note, *Disposition of the Mentally Ill Offender in Illinois—"Guilty but Mentally Ill,"* 31 DePaul L. Rev. 869, 889-90 (1982).

Although we agree with the defendant that section 5—2—6 of the Unified Code of Corrections is applicable to GBMI offenders, we do not believe that the statute may be understood as precluding the imposition of the death penalty. To the contrary, the plain language of the statute indicates otherwise. Section 5—2—6(a) provides, "The court may impose any sentence upon the defendant which could be imposed pursuant to law upon a defendant who had been convicted of the same offense without a finding of mental illness." Clearly, that language leaves available for GBMI offenders the full range of sentences—including the death penalty—that may be imposed on persons who are guilty of offenses and who are not mentally ill. This is entirely consistent with the legislature's definition of the term "mental illness" as a condition distinct from insanity. Section 6—2(c) of the Criminal Code of 1961 provides, "A person who, at the time of the commission of a criminal offense, was not insane but was suffering from a mental illness, is not relieved of criminal responsibility for his conduct and may be found guilty but mentally ill." (Ill. Rev. Stat. 1983, ch. 38, par. 6—2(c).) Section 6—2(d) of

the Criminal Code of 1961 provides, "For purposes of this Section, 'mental illness' or 'mentally ill' means a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior or is unable to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1983, ch. 38, par. 6—2(d).) A GBMI offender is no less guilty than one who is guilty and not mentally ill; unlike insanity, a GBMI finding or plea does not relieve an offender of criminal responsibility for his conduct. By its plain terms, section 5—2—6(a) authorizes imposition on a GBMI offender of any sentence that could be imposed on one convicted of the same offense without the additional finding of mental illness; the death penalty therefore is available as a sentence for GBMI offenders who have been convicted of murder (see Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3(c)(1)). We shall discuss later the relationship between mental illness and the statutory mitigating circumstance of extreme mental or emotional disturbance.

Opposing that interpretation of section 5—2—6 of the Unified Code of Corrections, the defendant argues that several provisions in that statute are inconsistent with imposition of the death penalty. The defendant first contends that the statement in section 5—2—6(a) authorizing the imposition of any sentence by "the court" should be understood as limiting the available sentences to those in which the jury has no role in the proceedings. Because the decision whether to impose the death penalty may be made by a jury, the defendant concludes that GBMI offenders, who are sentenced by "the court," may not be sentenced to death. We disagree and find no inconsistency with the capital sentencing provisions. With respect to the procedure to be used when a capital defendant requests a jury for his sentencing hearing,

section 9—1(g) of the Criminal Code of 1961 provides, "If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death." (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(g).) By the terms of the statute, the court and not the jury is the entity that imposes sentence; thus, there is no inconsistency between the death penalty provisions and the reference in section 5—2—6(a) to imposition of sentence by the court.

The defendant also contends that the provision in section 5—2—6(a) for the preparation of a presentence report for GBMI offenders—"After a plea or verdict of guilty but mentally ill ***, the court shall order a presentence investigation and report pursuant to Section 5—3—1 and 5—3—2 of this Act"—cannot be reconciled with this court's decision in *People v. Gaines* (1981), 88 Ill. 2d 342, 372-73, that a presentence investigation and report are not required for defendants in death penalty hearings. *Gaines* did not involve the GBMI provisions, however. The defendant in that case was convicted and sentenced to death before those provisions took effect, and thus there was no question presented in that case concerning the separate requirement of a presentence report for GBMI offenders. The requirement in section 5—2—6(a) may be construed as an additional protection afforded to GBMI offenders.

Finally, the defendant argues that sentencing a GBMI offender to death would be inconsistent with the treatment alternatives prescribed for GBMI offenders in section 5—2—6 of the Unified Code of Corrections. The provisions concerning treatment do not pertain to defendants sentenced to death, however. Rather, they apply to persons sentenced to terms of imprisonment (see Ill. Rev. Stat. 1983, ch. 38, pars. 1005—2—6(b), (c), (d)) and to those placed on probation or sentenced to a

term of periodic imprisonment or a period of conditional discharge (see Ill. Rev. Stat. 1983, ch. 38, par. 1005—2— 6(e)). The statute thus does not mandate what is referred to in the dissent as the "meaningless" requirement of treatment for one awaiting execution. Having rejected the defendant's interpretation of section 5—2— 6, we conclude that the statute does not preclude imposition of the death penalty on GBMI offenders.

The defendant also argues that imposing the death penalty on one who is guilty but mentally ill would be excessive punishment in violation of the eighth and fourteenth amendments to the Federal Constitution (U.S. Const., amends. VIII, XIV). The defendant would apply here the following standard:

> "[T]he Eighth Amendment bars not only those punishments that are 'barbaric' but also those that are 'excessive' in relation to the crime committed. Under *Gregg* [*v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909], a punishment is 'excessive' and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime. A punishment might fail the test on either ground." (*Coker v. Georgia* (1977), 433 U.S. 584, 592, 53 L. Ed. 2d 982, 989, 97 S. Ct. 2861, 2866.)

The defendant contends that imposing the death penalty on one who has been found mentally ill must be deemed excessive under *Coker* because it does not serve to advance either function of the death penalty, retribution and deterrence (see *Gregg v. Georgia* (1976), 428 U.S. 153, 183, 49 L. Ed. 2d 859, 880, 96 S. Ct. 2909, 2930 (plurality opinion)).

The defendant's argument misapprehends the nature of the GBMI finding. We have already noted that mental illness, as that term is used with respect to GBMI offenders, must not be equated with insanity and does not

relieve an offender of responsibility for his criminal conduct. Section 6—2(d) of the Criminal Code of 1961 provides, "For purposes of this Section, 'mental illness' or 'mentally ill' means a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior or is unable to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1983, ch. 38, par. 6—2(d).) The defendant's situation must be distinguished from that of a person who has been found not guilty by reason of insanity. A person found not guilty by reason of insanity is one who "lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law"; a finding of insanity functions as a complete defense to conviction, and accordingly no punishment is appropriate. (See Ill. Rev. Stat. 1983, ch. 38, par. 6—2(a).) A defendant who is mentally ill but not insane cannot make a similar claim. By definition, the GBMI offender is able to appreciate the wrongfulness of his behavior and is able to conform his conduct to the requirements of law. With respect to that offender, then, deterrence and retribution remain valid considerations in his punishment. (See *Harris v. State* (Ind. 1986), 499 N.E.2d 723, 726-27 (rejecting argument that imposition of death penalty on GBMI offender would be excessive punishment).) We note that there is no question presented here regarding the fitness to be executed of one who has been found or has pleaded guilty but mentally ill. See *Ford v. Wainwright* (1986), 477 U.S. 399, 91 L. Ed. 2d 335, 106 S. Ct. 2595; Ill. Rev. Stat. 1983, ch. 38, par. 1005—2—3.

The defendant also contends that the trial judge's stated reasons for imposing the death penalty in this case were inconsistent with his earlier finding of a fac-

tual basis for the defendant's GBMI plea. In accepting the defendant's plea the trial judge said:

"At this time, based upon your plea of guilty but mentally ill, Mr. Crews, and based upon the evidence that the Court heard regarding your mental condition at the time of the offense, the Court at this time is going to accept your plea of guilty but mentally ill to the charge of murder as alleged in count I of this Information and find that there is a sufficient factual basis in the record at this time to show that you were mentally ill at the time that [sic] the commission of this offense, and therefore your plea of guilty but mentally ill is accepted by the Court."

The defendant contrasts the trial judge's finding of a factual basis for the GBMI plea with a statement he later made in imposing the death penalty. At the sentencing hearing the trial judge said:

"But looking at the facts of this case and at the time he committed this act the Court is of the opinion that [the defendant] may not have been under an extreme mental or emotional disturbance, and to what extent he may have been under an extreme mental or emotional disturbance or what may be considered an extreme mental or emotional disturbance the Court is not of the opinion that in this case that it's sufficient to preclude the imposition of the death penalty."

The defendant contends that the trial judge's decision to accept the GBMI plea cannot be reconciled with his later statement, made at the sentencing hearing, that the defendant "may not have been under an extreme mental or emotional disturbance."

The defendant's argument assumes that mental illness, as that term is applied to GBMI offenders, is more serious than the mitigating circumstance of extreme mental or emotional disturbance, as that term is used in the death penalty statute. Section 9—1(c)(2) of the Criminal Code of 1961 includes as possible mitigation the commission of murder "while the defendant was under the

influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution." (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)(2).) We have already concluded that the legislature authorized imposition of the death penalty on GBMI offenders, and, consistent with that holding, we do not believe that a finding of mental illness necessarily establishes the mitigating circumstance of extreme mental or emotional disturbance. It is important to note here that the distinction between mental illness and the statutory mitigating circumstance of extreme mental or emotional disturbance does not mean that a GBMI plea or finding is irrelevant in a capital case. Because mitigating circumstances are not limited to those specifically enumerated in section 9—1(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)), evidence of a defendant's mental illness is admissible at a capital sentencing hearing regardless of the relationship between the GBMI provisions and the statutory mitigating circumstance of extreme mental or emotional disturbance. The trial judge's decision here to sentence the defendant to death was not contrary to the findings he made in accepting the defendant's GBMI plea. In accordance with the provisions of section 9—1(h) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(h)), the trial judge balanced the conflicting evidence and found that any mental or emotional disturbance of the defendant was not sufficient to preclude imposition of the death penalty. See *People v. Gacy* (1984), 103 Ill. 2d 1, 102.

Contrary to the view of the dissent, the existence of special procedures that must be used in the trial court in making a GBMI finding or in accepting a GBMI plea does not mean that mental illness must invariably be viewed as a more serious condition than the mitigating circumstance of extreme mental or emotional disturbance. Those procedures have nothing to do with the

sentencing hearing in a capital case. For example, the special verdict form required by section 115—4(j) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 115—4(j)) is designed to distinguish mental illness from the defense of insanity; it does not incorporate in the judgment of conviction the mitigating circumstance of extreme mental or emotional disturbance. There is no logical or historical reason for concluding that a plea or finding of mental illness at trial necessarily establishes for purposes of a death penalty hearing the statutory mitigating circumstance of extreme mental or emotional disturbance. Neither concept is defined in terms of the other, and the existence of one neither entails nor excludes the existence of the other. *People v. Carlson* (1980), 79 Ill. 2d 564, cited by the dissent, was decided before the GBMI provisions went into effect and therefore is not relevant here.

## II

The defendant next contends that the trial judge erred in denying a motion made by defense counsel to withdraw as counsel in this case. At the outset of the proceedings in the circuit court, before the preliminary hearing was held, the defendant's appointed counsel moved to withdraw from representation. Defense counsel explained that he was making the motion at the defendant's request because the defendant was concerned about the number of prison officers and employees with whom counsel was acquainted. The trial judge denied the withdrawal motion, and the defendant argues here that the ruling denied him his right to have counsel free from conflicts of interest. See *Wood v. Georgia* (1981), 450 U.S. 261, 271, 67 L. Ed. 2d 220, 230, 101 S. Ct. 1097, 1103; *People v. Lewis* (1981), 88 Ill. 2d 429, 436.

The conflict asserted here is based on counsel's personal rather than professional relationships, and under

*Lewis,* unless the personal relationship was one involving substantial emotional ties, the defendant must therefore show that he was actually prejudiced by counsel's representation. In *Lewis,* the defendant was charged with murder and armed robbery for a bank robbery in which a bank guard was killed. The defendant's appointed counsel was acquainted with the guard and had attended his funeral. This court held that the nature of counsel's acquaintance with the victim did not warrant reversal of the defendant's convictions absent a showing of prejudice. That rule was later followed in *People v. Davis* (1983), 97 Ill. 2d 1. In *Davis,* defense counsel was acquainted with a person whom the defendant was accused of murdering. In rejecting the defendant's argument that counsel had labored under a conflict of interest, the court said, "Where personal relationships are at issue, we must presume that an attorney will not undertake to represent a defendant if his professional duty will be hampered by emotional ties." 97 Ill. 2d at 16.

In this case, counsel made the motion to withdraw at the defendant's request; counsel did not say that he did not believe that he could fairly represent the defendant. Moreover, the record shows only that defense counsel was socially acquainted with a number of the officials and other employees at the prison. Defense counsel had previously served as State's Attorney of Randolph County and apparently the acquaintances were formed during that time.

The defendant also points to a statement made by defense counsel during closing argument at the sentencing hearing. Counsel said to the trial judge, "You know yourself, I didn't want to have to defend Mr. Harbison [*sic*]. I came here and asked to be removed"; counsel mistakenly substituted the murdered guard's name for the defendant's. We do not interpret counsel's reference to the earlier motion to withdraw as an indication that

he did not believe that he could fairly represent the defendant. Immediately before counsel made the remark, he referred to the absence of any evidence of provocation or motive for the defendant's attack on the two prison guards and noted that the defendant committed the attack without making any attempt to conceal his identity and without having any opportunity for escape. Within that context, then, counsel's statement was an attempt to vouch for the senselessness of the defendant's crime, and in that way to bolster the argument that the defendant was suffering from a mental disturbance at the time of the offenses.

### III

The defendant also contests the State's use of victim impact evidence at the sentencing hearing. The evidence was admitted without objection from defense counsel, and the defendant argues here that the introduction of the evidence was plain error, and, alternatively, that counsel's failure to make an appropriate objection constituted ineffective assistance under *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

The evidence at issue consisted of a brief typewritten statement signed by the widow of Cecil Harbison, the slain prison guard. Mrs. Harbison did not testify at the sentencing hearing; rather, her statement was read into the record by a Department of Corrections investigator. The statement said, in its entirety:

"I, Debbie Harbison, state that I am the wife of Cecil Harbison, now deceased. I am writing this statement to show the impact of the murder of my husband upon myself and my family. I am not sure that I can describe the pain that was inflicted upon me when I was told of the stabbing and death of my husband. Words cannot describe the emotions that I have felt and the need to strike back in the ten months since I lost my husband. Further,

at the time Cecil passed away, I was with child and this child was later born. This child will never know what it would be like to grow up with a father. This child will miss the companionship, nurture, discipline and support that should be provided by a father. As for myself, I believe my life will never be the same. The principal wage earner for my family is lost. Things that we had planned both in an economic and personal manner of speaking for our lives have been either delayed or forever lost."

In *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, the United States Supreme Court held that a jury's consideration of victim impact evidence at a capital sentencing hearing violates the eighth amendment to the Federal Constitution (U.S. Const., amend. VIII). The evidence in that case consisted of a victim impact statement compiled from interviews with the son, daughter, son-in-law, and granddaughter of an elderly couple who had been murdered, and the statement contained an extensive summary of the effects of the crimes on the surviving family members. In accordance with Maryland law, the statement was introduced into evidence at the defendant's capital sentencing hearing. The Supreme Court held that use of the statement at the sentencing hearing was error. The Court believed that the information describing the effect of the crime on the victims' family members was irrelevant and would divert the jury's attention from its consideration of the circumstances of the offense and the nature and character of the defendant. The Court noted that the contents of victim impact statements would vary from case to case, for some families would be less willing to express their feelings, or less articulate in doing so. Also, the Court did not believe that imposition of the death penalty should be allowed to depend on the standing of the victim in the community and feared that a defendant's efforts to rebut the information in the victim

impact statement would only distract the jury from its consideration of the offense and the offender. (*Booth v. Maryland* (1987), 482 U.S. 496, 504-07, 96 L. Ed. 2d 440, 449-51, 107 S. Ct. 2529, 2533-35.) In *Booth* the victim impact statement also set out the surviving family members' characterizations of the crimes, and the Supreme Court ruled that information of that nature was also inadmissible at a capital sentencing hearing. *Booth v. Maryland* (1987), 482 U.S. 496, 508-09, 96 L. Ed. 2d 440, 451-52, 107 S. Ct. 2529, 2535-36.

The sentencing hearing in this case was conducted before the trial judge alone, the defendant having waived his right to a jury. Although the Supreme Court did not indicate in *Booth* that the rule announced in that case was limited to jury proceedings, we believe that the distinction is important here. The prosecuting attorney referred to Mrs. Harbison's statement only once, and that came in rebuttal, in response to defense counsel's argument that sentencing the defendant to death would not serve any deterrent purpose; the prosecuting attorney said that the effect of the crime on the victim's family members illustrated the value of capital punishment. Moreover, the trial judge did not rely on the evidence in imposing sentence. He discussed at length his reasons for sentencing the defendant to death, and he did not refer to Mrs. Harbison's statement. On this record, then, we are satisfied that the victim impact statement played no part in the trial judge's decision to sentence the defendant to death. Applying the standard applicable to Federal constitutional errors (see *Chapman v. California* (1967), 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 828), we conclude that the error in introducing the victim impact statement into evidence was harmless beyond a reasonable doubt.

## IV

The defendant also contends that he was denied a fair sentencing hearing by comments made by the prosecuting attorney in closing argument. Defense counsel did not object to the remarks in question, and the defendant makes the companion argument that counsel's failure to object constituted ineffective assistance.

In argument at the sentencing hearing, the prosecutor referred to *People v. Gacy* (1984), 103 Ill. 2d 1, and noted correctly that the defendant in that case was sentenced to die in spite of defense evidence revealing serious personality and psychological disorders, a judgment that this court affirmed. Later, the prosecutor said:

> "Although Mr. Crews has not murdered as many people as Mr. Gasey [*sic*] although his—he has personality disorders identified by witnesses similar to what we had in the *Gasey* [*sic*] case. We have similar diagnoses and similar bad patterns of behavior while he was at Menard and the Court is aware of them, and I think when the Court balances—and I would urge the Court to balance all of this out and consider it against the psychiatric testimony—when you balance it all out I do not feel that if Mr. Crews was operating under that extreme emotional or mental disturbance it is not sufficient to balance out the crime in this case, ***."

In his rebuttal argument, the prosecuting attorney returned to that theme, stating:

> "And [defense counsel] tried discounting the *Gasey* [*sic*] case, but I think in *Gasey* [*sic*] the Court was telling us, although the guilty but mentally ill statute was not in effect, certainly our current death penalty statute was in effect, Judge, and I think that Supreme Court case told us that when you have a bad enough actor, a bad actor like Mr. Crews, a bad actor like John Wayne Gasey [*sic*], and a bad actor like others that the Court has affirmed the death penalty on, that if they have experts come in and testify that he's suffering from this or that disorder

the Court can nevertheless weigh their testimony and find that it's not sufficient to preclude the death penalty and I would urge the Court to do so."

The defendant contends that the argument concerning *Gacy* was improper and prejudicial. The defendant believes that the prosecutor assumed the existence of facts not in evidence and that the comparison with *Gacy* was irrelevant and unreliable. The defendant points out that the defendant in *Gacy* was not found guilty but mentally ill and observes that the trial judge here had no knowledge of the evidence introduced in *Gacy* concerning that defendant's mental or psychological condition.

Defense counsel strenuously insisted at the sentencing hearing that death was not available as a punishment in this case, emphasizing that the trial judge had already found a factual basis for the defendant's GBMI plea. There was testimony at the sentencing hearing that the death penalty had never been imposed on a defendant found GBMI, and the prosecutor recognized that Gacy was tried before the GBMI finding became available in this State. The main points of the prosecutor's argument were that the sentencing authority in a death penalty hearing must weigh or balance the evidence in aggravation and mitigation and that the defendant's evidence regarding his mental condition at the time of the offense should not automatically preclude imposition of the death penalty. The prosecutor correctly cited *Gacy* in support of those views. In *Gacy* the court said:

"We need not address the argument whether the jury was required to accept that the collective expert testimony in this case established that defendant was suffering from an extreme mental or emotional disturbance. As the People correctly point out, the decision at sentencing in a capital case is a balancing process. (*People v. Brownell* (1980), 79 Ill. 2d 508.) While many labels were placed on defendant's mental condition, all of the People's experts characterized defendant's defect as a per-

sonality or character disorder." (*People v. Gacy* (1984), 103 Ill. 2d 1, 101-02.)

The prosecutor's argument at the sentencing hearing was consistent with *Gacy*. We do not believe that his references to that case injected unreliable or unproved evidence into the proceeding here or diverted the trial judge's attention from his consideration of the defendant and the offenses.

## V

The defendant also makes a number of general constitutional challenges to the Illinois death penalty statute. (See Ill. Rev. Stat. 1983, ch. 38, par. 9—1.) First, he argues that the statute is unconstitutional because, in his interpretation, it forbids the sentencing authority to consider sympathy in determining whether to impose the death penalty. The defendant cites *People v. Morgan* (1986), 112 Ill. 2d 111, as the source of that restriction, and he contends that the rule violates the eighth and fourteenth amendments. It may be noted that the defendant does not point to any statements made by the trial judge in this case that would indicate that he was following such a rule, nor have we found any.

We do not agree with the defendant's interpretation of *Morgan*. That case reaffirmed the court's previous decisions that it was "not improper" (*People v. Perez* (1985), 108 Ill. 2d 70, 92; *People v. Stewart* (1984), 104 Ill. 2d 463, 494) to instruct a jury that "[n]either sympathy nor prejudice should influence you. You should not be influenced by any person's race, color, religion, or national ancestry" (Illinois Pattern Jury Instructions, Criminal, No. 1.01(5) (2d ed. 1981) (IPI Criminal 2d); see IPI Criminal 2d Nos. 7A.02, 7A.10, 7A.14 (adopting No. 1.01 for use in unitary and bifurcated death penalty hearings)). The defendant in *Morgan* chose to be tried by a jury and sentenced by the trial judge; because the trial

judge had used the sympathy and prejudice instruction in his questioning of prospective jurors, the defendant assumed that in deciding to impose the death penalty the trial judge followed the same principle and excluded sympathy from his considerations. The court in *Morgan* did not believe that error had occurred; the court noted that the judge or jury may consider any relevant mitigating evidence in deciding whether to impose the death penalty. *People v. Morgan* (1986), 112 Ill. 2d 111, 145-46.

An instruction like IPI Criminal 2d No. 1.01(5) was recently approved by the Supreme Court in *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837. *Brown* held that it was proper to instruct a jury in a capital sentencing proceeding that it "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." The Court rejected the defendant's argument that the reference in the instruction to sympathy would interfere with the jury's consideration of mitigating evidence. Rather, the Court concluded that a juror, receiving the instruction at the close of the sentencing hearing, would "understand the instruction not to rely on 'mere sympathy' as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase." (479 U.S. at 542, 93 L. Ed. 2d at 940, 107 S. Ct. at 840.) The Court noted that the other influences referred to in the instruction—sentiment, conjecture, passion, prejudice, public opinion, and public feeling—would reinforce that interpretation.

A similar distinction may be found in the decisions of this court concerning the appropriate role of sympathy in death penalty proceedings. Those cases have emphasized that an instruction in the form of IPI Criminal 2d No. 1.01(5) does not prevent the defendant from introducing, or the judge or jury from considering, evidence in mitigation. (See *People v. Wright* (1985), 111 Ill. 2d 128, 163-68

(no error in the trial judge's refusal to consider sympathy for the defendant in deciding whether to impose the death penalty; in making his decision, the trial judge considered all the mitigating evidence presented by the defendant); *People v. Stewart* (1984), 104 Ill. 2d 463, 494 ("Here the jury was instructed that it would consider 'any facts or circumstances that provide reasons for imposing less than the death penalty,' and the defendant was permitted to present all evidence which he considered mitigating. In closing argument defense counsel twice appealed to the jury's sense of mercy. There was no violation of the right to a fair hearing").) There is no indication in this case that the trial judge, in deciding to impose the death penalty, failed to consider any circumstances that would have been mitigating.

The defendant also argues that the Illinois death penalty statute is unconstitutional because it fails to eliminate the risk of an arbitrary or capricious imposition of the death sentence. This court has previously rejected, however, the contentions made by the defendant here. The sentencing scheme is not invalid for the discretion it vests in the prosecutor in deciding whether to seek the death penalty. (*People v. Lewis* (1981), 88 Ill. 2d 129, 146; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-43.) The State is not constitutionally required to provide pretrial notice of the aggravating circumstances it intends to rely on at the sentencing hearing (*People v. Gaines* (1981), 88 Ill. 2d 342, 369), nor is the State constitutionally required to bear a burden of persuasion at the second stage of the sentencing hearing (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 68; *People v. Garcia* (1983), 97 Ill. 2d 58, 80-82; *People v. Free* (1983), 94 Ill. 2d 378, 421; *People v. Brownell* (1980), 79 Ill. 2d 508, 531-34). There is no requirement that the sentencing judge or jury make a separate finding that death is the appropriate penalty (*People v. Whitehead* (1987), 116 Ill. 2d 425, 462-63; *Peo-*

*ple v. Morgan* (1986), 112 Ill. 2d 111, 147; *People v. Albanese* (1984), 104 Ill. 2d 504, 536-37), nor is it necessary that the sentencing authority provide written findings concerning its decision to impose the death penalty (*People v. King* (1986), 109 Ill. 2d 514, 550-51; *People v. Stewart* (1984), 104 Ill. 2d 463, 497; *People v. Kubat* (1983), 94 Ill. 2d 437, 504; *People v. Gaines* (1981), 88 Ill. 2d 342, 383; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44). Comparative proportionality review is not required under the Federal Constitution (*Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871), and the Illinois statute is not invalid for failing to prescribe methods for that type of review in death penalty cases (*People v. King* (1986), 109 Ill. 2d 514, 551; *People v. Stewart* (1984), 104 Ill. 2d 463, 499; *People v. Kubat* (1983), 94 Ill. 2d 437, 502-04; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44).

Finally, the defendant contends that the sentencing scheme is unconstitutional because those defendants tried with the aid of certain forms of special communicative assistance are exempted from the death penalty (see Ill. Rev. Stat. 1983, ch. 38, pars. 104—22, 104—26). We have previously rejected this argument (see *People v. Whitehead* (1987), 116 Ill. 2d 425, 460-62), and we decline to reconsider that holding here.

## VI

For the reasons stated, the defendant's convictions and sentences are affirmed. The clerk of this court is directed to enter an order setting Wednesday, May 25, 1988, as the date on which the sentence of death, entered in the circuit court of Randolph County, is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). The clerk of this court shall send a

certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is confined.

*Judgment affirmed.*

JUSTICE CLARK, concurring:

If I were a philosopher-king or a Platonic Guardian I might adhere to the views of my learned brother Justice Simon on the propriety of sentencing a guilty but mentally ill (GBMI) defendant to death. Since, however, I am not a philosopher-king or a Platonic Guardian but only a judge sworn to uphold the laws of Illinois, I must endeavor to determine whether the legislature truly intended to exempt GBMI defendants from the death penalty. Since I agree with the majority that the legislature did not so intend, I concur.

If the enactment of the GBMI statute precluded GBMI defendants from being sentenced to death, it would radically transform our capital punishment statutes. A large class of defendants, hitherto subject to the death penalty, would now be exempt. Before I could agree that the legislature intended such a change, I would need to see better evidence for it than that which the dissent provides.

The dissent's quotation from a statement by the bill's co-sponsor proves little or nothing. Taken in context, the statement that a "guilty but mentally ill defendant, *for example*, can be ... *sentenced exactly as a healthy defendant charged with the same crime*, except that his sentence, either to probation, periodic imprisonment, or to the penitentiary, must include psychiatric and psychological treatment or counseling" (emphasis added) (82d Ill. Gen. Assem., Senate Proceedings, May 27, 1981, at 131) was obviously intended to reassure the legislators that a guilty but mentally ill defendant would receive no lesser

punishment than a sane defendant convicted of the same crime. There is no indication that the co-sponsor's list of possible punishments was intended to exclude the imposition of the death penalty. Had that been the intent, it would have been easy to include language so providing in the GBMI statute.

More generally, I cannot agree that the provision of rehabilitative treatment to a prisoner condemned to death is an exercise in futility. A death row inmate is not a castaway on a desert island. He remains a member of society. He has civil rights and duties. A substantial fraction of his life may pass while he awaits execution. Pardon, commutation, or a successful appeal may abrogate his sentence entirely.

He can do much good, or much harm, in the time which remains to him. Untreated, he may murder a fellow prisoner or a guard. Treated, he may be able to function as a useful member of prison society. I would far prefer to see a GBMI death row inmate talking to a psychiatrist instead of fashioning a shiv, and I am willing to believe that the legislature thought likewise. I therefore see no inconsistency in statutorily providing a condemned prisoner with the opportunity for psychiatric treatment. No one would argue that the treatment of an ordinary mental patient is rendered futile by the fact that the patient will not live forever. It is a truism that no one escapes from life alive; in that sense we are all under a sentence of death.

I am also uncertain that exempting GBMI inmates from death would make much difference in the actual administration of the penalty. So long as GBMI defendants are not entitled to any reduction in their punishment, prosecutors will have little reason to contest pleas of GBMI. Should a GBMI finding mean the difference between life and death, however, prosecutors will be less likely to cooperate in supporting a GBMI plea.

I also cannot agree with the dissent that there is an inconsistency between finding a defendant GBMI and failing to find as mitigation that he was suffering from extreme mental or emotional disturbance. I see no support for the dissent's contention that there is a hierarchy of mental states, varying in degree of derangement from insanity to GBMI "mental illness" to extreme emotional disturbance. Without going into detail, I think that these mental states differ in kind, rather than merely in degree, for they appear in different contexts and serve different purposes. GBMI "mental illness" refers to a continuing state of mind which renders it likely that a defendant will benefit from treatment, while "extreme mental or emotional disturbance" refers to a state of mind which either makes it less likely that the persons who commit crimes while in such a state will actually be deterred by the death penalty, or which makes such persons less deserving objects of the community's need for retribution.

Finally, I note that this defendant was fully informed, on the record, that his voluntary plea of GBMI might result in the sentence of death. Had he not been so informed, I would have voted to reverse.

JUSTICE WARD joins in this concurrence.

JUSTICE SIMON, dissenting:

The majority commits a serious error in upholding the death sentence of a defendant who has been found guilty but mentally ill (GBMI). The trial judge, after hearing the testimony of numerous witnesses, including three psychiatrists, concluded that there was a sufficient factual basis in the record to establish that the defendant was mentally ill at the time of the offense and accepted his GBMI plea. After a sentencing hearing, the judge sentenced the defendant to death. This determination is contrary to the clear intent of the Illinois legisla-

ture that those persons found guilty but mentally ill not be sentenced to death.

The appropriate sentences for those found guilty but mentally ill are found in section 5—2—6 of the Unified Code of Corrections, which is entitled "Sentencing and Treatment of Defendant Found Guilty but Mentally Ill" (Ill. Rev. Stat. 1983, ch. 38, par. 1005—2—6). These sentences specifically refer to imprisonment in the Department of Corrections or the Department of Mental Health and Developmental Disabilities, periodic imprisonment, probation and conditional discharge, but not death. Because the allowable sentencing provisions are specifically set forth, they limit the general language in section 5—2—6(a), upon which the majority relies. The omission of the death penalty in the section indicates the legislature's intent to prohibit the death penalty in the sentencing of GBMI defendants. The legislature's decision to place the sentencing provisions for GBMI offenders in chapter V of the Unified Code of Corrections, which deals with sentences other than sentences of death, further demonstrates its intent to forbid the imposition of the death penalty for GBMI defendants.

Additional evidence of the legislature's intent is the fact that certain provisions of the GBMI sentencing statute are inconsistent with death penalty proceedings. For example, although defendants sentenced to death have no right to a presentence report (*People v. Gaines* (1981), 88 Ill. 2d 342, 373), the sentencing statute for GBMI offenders specifically requires the trial court to order a presentence investigation and report (Ill. Rev. Stat. 1983, ch. 38, par. 1005—2—6(b)). Similarly, the GBMI statute provides that "the court" should impose sentence upon the defendant (Ill. Rev. Stat. 1983, ch. 38, par. 1005—2—6(a)), while defendants subject to the imposition of the death penalty have the right to have a jury determine whether the death sentence should be imposed

(Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d)). Both provisions are concerned, not with whether the court or a jury pronounces the actual sentence, but rather with which agency of the judicial system (judge or jury) decides that a particular sentence should be imposed. Thus, section 5—2—6(a) refers to the court imposing a sentence, while section 9—1(g) provides that a jury may be called upon to determine whether a death sentence should be imposed.

A sentence of death is completely inconsistent with the goals of the GBMI statutory provisions—providing treatment for the mentally ill as well as punishing them for the crimes they committed. During a reading of the GBMI bill on the Senate floor, the bill's co-sponsor, Senator Adeline J. Geo-Karis, emphasized this goal of treatment, stating that a "guilty but mentally ill defendant, for example, can be . . . sentenced exactly as a healthy defendant charged with the same crime, except that his sentence, either to probation, periodic imprisonment, or to the penitentiary, must include psychiatric and psychological treatment or counseling." (82d Ill. Gen. Assem., Senate Proceedings, May 27, 1981, at 131. See also 82d Ill. Gen. Assem., House Proceedings, June 27, 1981, at 136-37.) The bill as enacted includes this requirement of treatment for the offender's mental illness. (Ill. Rev. Stat. 1983, ch. 38, pars. 1005—2—6(b), (c), (e).) The statute also requires the Department of Corrections to make periodic inquiry and examination "concerning the nature, extent, continuance, and treatment of the defendant's mental illness" for those GBMI offenders who are imprisoned. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—2—6(b).) The Department of Corrections is also to provide psychological, psychiatric and other counseling and treatment to the defendant and may transfer the inmate to the Department of Mental Health if necessary. (Ill. Rev. Stat. 1983, ch. 38, pars. 1005—2—6(b), (c).) This treatment require-

ment, however, would be meaningless for someone who is going to be put to death. "In view of the statutory treatment rights that underlie a GBMI verdict, to order death as a GBMI's treatment would not only be contrary to the legislature's objectives, but also would be morally reprehensible." Note, *Disposition of the Mentally Ill Offender in Illinois—"Guilty but Mentally Ill,"* 31 De Paul L. Rev. 869, 889-90 (1982).

The majority notes that a GBMI finding does not relieve an offender of criminal responsibility for his conduct. While this is correct, a GBMI finding is also a recognition that the offender's judgment was impaired at the time of the offense due to a mental illness. (Ill. Rev. Stat. 1983, ch. 38, par. 6—2(d).) The legislature, recognizing that offenders suffering from a mental illness merit special consideration, enacted a special sentencing provision for GBMI offenders that mandates treatment for the mental illness as well as punishment. The imposition of the death penalty on a GBMI offender flies in the face of this specific GBMI sentencing provision and the legislature's intent to provide psychiatric help to offenders suffering from a mental illness.

The concurring opinion relies on the fact that section 5—2—6 does not prohibit sentencing a GBMI offender to death. Legislative enactments regarding sentencing, however, do not normally include a laundry list of penalties that may *not* be imposed for a particular crime; rather, customarily they give the range of penalties that are permissible.

Even if the legislature's intent not to allow GBMI offenders to be sentenced to death were not so clear, a new sentencing hearing would nevertheless be necessary because in sentencing the defendant the judge failed to give proper weight to the fact that the defendant is mentally ill. In accepting the GBMI plea, the judge found that there was a sufficient factual basis in the record to

show that the defendant was mentally ill at the time he committed the offense. When sentencing the defendant, however, the judge stated, "But looking at the facts of this case and at the time he committed this act the Court is of the opinion that he may not have been under an extreme mental or emotional disturbance ***." The court then sentenced the defendant to death.

Section 9—1(c)(2) of the Criminal Code of 1961 requires the court in a capital sentencing hearing to consider as a mitigating factor that "the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution." (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)(2).) The trial court's determination that the defendant may not have been under the influence of an extreme emotional disturbance at the time of the offense is inconsistent with its earlier ruling that the defendant was mentally ill at the time of the offense. The majority here concludes that a finding of mental illness does not necessarily establish the mitigating circumstance of mental or emotional disturbance. On the contrary, a finding of mental illness is a recognition of the likelihood of a more serious disorder than the mental state of an extreme emotional disturbance.

Under Illinois law, a finding of mental illness is a recognition that the defendant's judgment at the time of the offense was seriously impaired, a mental state exceeded only by insanity, a complete defense. (Ill. Rev. Stat. 1983, ch. 38, par. 6—2(d).) The legislature has provided for a special verdict form for GBMI defendants. (Ill. Rev. Stat. 1983, ch. 38, par. 115—4(j).) Thus mental illness is unique among mitigating factors because it is the only one that can be incorporated into the judgment at trial. Finally, in order for a GBMI plea to be accepted, the defendant must be examined by a clinical psychologist or psychiatrist, the judge must examine the psychi-

atric or psychological report or reports and conduct a hearing on the issue of the defendant's mental health. Ill. Rev. Stat. 1983, ch. 38, par. 115—2(b).

A finding of extreme mental or emotional disturbance requires none of the above procedures, indicating that the standard for this mitigating factor is much less stringent than that for mental illness. The failure to require a psychological or psychiatric examination to establish an extreme mental or emotional disturbance indicates that it can be established without a finding of mental illness, thus making it a much broader, less serious condition than mental illness. This is evidenced by cases where an extreme mental or emotional disturbance has been found without a finding that the defendant was mentally ill at the time of the offense. (See, *e.g., People v. Carlson* (1980), 79 Ill. 2d 564, 588-89.) Moreover, a finding of extreme mental or emotional disturbance does not necessitate treatment for the offender, and there is no special verdict form for this type of disturbance.

The conclusion of the trial court and the majority that a finding of mental illness does not necessarily establish the mitigating factor of extreme mental or emotional disturbance is therefore clearly in error. By failing to recognize that mental illness is a more serious condition than extreme mental or emotional disturbance, the sentencing court did not give proper weight to the defendant's illness as a mitigating factor, and a new sentencing hearing is required.

For the foregoing reasons, I believe that serious errors were committed at the sentencing hearing, requiring reversal of the capital sentence and a new sentencing hearing, and I therefore respectfully dissent.